Slip Op. 22-153

## UNITED STATES COURT OF INTERNATIONAL TRADE

COALITION FOR FAIR TRADE IN
HARDWOOD PLYWOOD,

      Plaintiff,

and

RICHMOND INTERNATIONAL
FOREST PRODUCTS LLC, TARACA
PACIFIC INC., CONCANNON
CORPORATION, XUZHOU
JIANGHENG WOOD PRODUCTS CO.,
LTD., and XUZHOU JIANGYANG
WOOD INDUSTRIES CO., LTD.,

      Consolidated Plaintiffs,

v.

UNITED STATES,

      Defendant,

and

RICHMOND INTERNATIONAL
FOREST PRODUCTS LLC, TARACA
PACIFIC INC., CONCANNON
CORPORATION, LINYI CHENGEN
IMPORT AND EXPORT CO., LTD.,
XUZHOU JIANGHENG WOOD
PRODUCTS CO., LTD., and XUZHOU
JIANGYANG WOOD INDUSTRIES
CO., LTD.,

      Defendant-Intervenors.

Before: Jennifer Choe-Groves, Judge

Consol. Court No. 20-03930

Consol. Court No. 20-03930                                                      Page 2

**OPINION AND ORDER**

[Sustaining the U.S. Department of Commerce's final determination in the first
administrative review of the antidumping duty order on certain hardwood plywood
products from the People's Republic of China and granting Defendant United
States' motion to strike.]

Dated:  December 22, 2022

Timothy C. Brightbill, Stephanie M. Bell, Tessa V. Capeloto, and Jeffrey O. Frank,
Wiley Rein LLP, of Washington, D.C., for Plaintiff Coalition for Fair Trade in
Hardwood Plywood.

Jeffrey S. Grimson and Jill A. Cramer, Mowry & Grimson, PLLC, of Washington,
D.C., for Consolidated-Plaintiffs and Defendant-Intervenors Richmond
International Forest Products LLC, Taraca Pacific Inc. and Concannon
Corporation.

Gregory S. Menegaz, Alexandra H. Salzman, and J. Kevin Horgan, deKieffer &
Horgan, PLLC, of Washington, D.C., for Consolidated Plaintiffs and Defendant-
Intervenors Xuzhou Jiangheng Wood Products Co., Ltd. and Xuzhou Jiangyang
Wood Industries Co., Ltd., and Defendant-Intervenor Linyi Chengen Import and
Export Co., Ltd.

Sonia M. Orfield, Trial Attorney, Commercial Litigation Branch, Civil Division,
U.S. Department of Justice, of Washington, D.C., for Defendant United States.
With her on the brief were Brian M. Boynton, Acting Assistant Attorney General,
Jeanne E. Davidson, Director, and Tara K. Hogan, Assistant Director.  Of counsel
on the brief was Savannah Maxwell, Office of the Chief Counsel for Trade
Enforcement and Compliance, U.S. Department of Commerce.

        Choe-Groves, Judge:  This case involves hardwood and decorative plywood,

as well as certain veneered panels.  This consolidated action challenges several

aspects of the final results filed by the U.S. Department of Commerce

("Commerce") in the first administrative review of the antidumping duty order

covering hardwood plywood from the People's Republic of China ("China").  See

Certain Hardwood Plywood Products from the People's Republic of China ("Final

Results"), 85 Fed. Reg. 77,157 (Dep't of Commerce Dec. 1, 2020) (final results of

antidumping duty administrative review; 2017–2018), and accompanying issues

and decision memorandum dated November 23, 2020 ("Final IDM"), PR 210[1]; see

also 19 U.S.C. § 1675 (periodic review of the amount of duty).[2]  The period of

review is June 23, 2017 through December 31, 2018.  Final IDM at 1.  For the

following reasons, the Court sustains the Final Results.

### ISSUES PRESENTED

The Court reviews the following issues:

1.  Whether Commerce's calculation of normal value for Linyi Chengen

Import and Export Co., Ltd. ("Linyi Chengen") using Commerce's normal

methodology, and not the intermediate input methodology, was based on

substantial evidence;

2.  Whether Commerce's selection of the surrogate value data for Linyi

Chengen's log inputs and calculation of the surrogate value for logs was based on

substantial evidence;

---

[1]  Unless otherwise indicated, citations to the administrative record reflect the
public record ("PR") document numbers filed in this case, ECF No. 46.
[2]  All statutory citations are to the 2018 edition of the United States Code; all
citations to regulations are to the 2020 edition of the Code of Federal Regulations.

3.   Whether Commerce's selection calculation of the surrogate value for labor was based on substantial evidence;

4.   Whether the reply brief submitted by Linyi Chengen and Consolidated Plaintiffs and Defendant-Intervenors Xuzhou Jiangheng Wood Products Co., Ltd. and Xuzhou Jiangyang Wood Industries Co., Ltd. raises new arguments and includes new factual information that were not before Commerce;

5.   Whether Commerce's selection of the surrogate value for Linyi Chengen's formaldehyde input was supported by substantial evidence; and

6.   Whether Commerce's selection of financial statements and calculation of surrogate financial ratios were supported by substantial evidence.

## BACKGROUND

### I.    Introduction

An administrative review of the dumping margin involves a comparison of the subject merchandise's U.S. export price or constructed export price with its "normal value" in the home market (or a comparable third country if there are no useable sales in the home market).  19 U.S.C. § 1675(a)(2)(A).  The process resembles the determination of the margin of dumping in the antidumping duty investigation, pursuant to which Commerce determines whether imports of subject merchandise are, or are likely to be, sold in the United States at "less than fair

value."[3]  See 19 U.S.C. § 1673d(a)(1); see, e.g., Certain Hardwood Plywood

Products from the People's Republic of China ("Investigation"), 82 Fed. Reg.

53,460 (Dep't of Commerce Nov. 16, 2017) ("final determination of sales at less

than fair value, and final affirmative determination of critical circumstances, in

part") and accompanying issues and decision memorandum.  The dumping margin,

if any, is the amount by which the subject merchandise's normal value exceeds its

U.S. price.  See, e.g., 19 U.S.C. §§ 1677a(a)–(b), 1677b(a)(1), 1677(35)(A).

        In April 2019, Commerce initiated the first administrative review of the

antidumping duty order on certain hardwood plywood products from China to

determine the dumping margins for the period of review.  See Initiation of

Antidumping and Countervailing Duty Administrative Reviews, 84 Fed. Reg.

12,200 (Dep't of Commerce Apr. 1, 2019).  The period of review was June 23,

2017 through December 31, 2018.  See id. at 12,202.

---

[3]  In an antidumping investigation, Commerce compares average U.S. price to
average normal value, whereas in a review the comparison is normally between
U.S. price and a weighted average normal value calculated on a monthly basis on
an entry-by-entry basis.  See Corus Staal BV v. Dep't of Commerce, 395 F.3d
1343, 1347 (Fed. Cir. 2005); see also, e.g., 19 U.S.C. § 1673 (requiring imposition
of additional duties "in an amount equal to the amount by which the normal value
exceeds the export price (or the constructed export price) for the merchandise"); 19
U.S.C. § 1673b(d)(1)(A)(i) (preliminary proceedings); 19 U.S.C.
§ 1673d(c)(1)(B)(i)(I) (final proceedings).

Commerce selected as mandatory respondents Linyi Chengen and

Lianyungang Yuantai International Trade Co. ("Lianyungang Yuantai"). See

Certain Hardwood Plywood Products from the People's Republic of China

("Preliminary Results"), 85 Fed. Reg. 7270 (Dep't of Commerce Feb. 7, 2020)

(preliminary results of antidumping duty administrative review; 2017–2018), and

accompanying preliminary issues and decision memorandum ("Prelim. IDM"), PR

163. See also Commerce's Mem. Re: Certain Hardwood Plywood Products from

the People's Republic of China: Respondent Selection (May 16, 2019), PR 69.

Lianyungang Yuantai notified Commerce that it desired to withdraw from

participating in the review. See Lianyungang Yuantai's Letter Withdrawing

Request Admin. Rev. (Jul. 1, 2019), PR 84. Commerce subsequently rescinded the

administrative review with respect to 29 companies for which all review requests

were timely withdrawn, including Lianyungang Yuantai. See Certain Hardwood

Plywood Products from the People's Republic of China, 84 Fed. Reg. 62,509

(Dep't of Commerce Nov. 15, 2019) (partial rescission of antidumping duty

administrative review; 2017–2018).

For this proceeding, Commerce continued to consider China to be a non-

market economy country, which implicated how the normal value of the subject

merchandise was to be determined. See Antidumping Duty Investigation of

Certain Aluminum Foil from the People's Republic of China, 82 Fed. Reg. 50,858,

50,861 (Dep't of Commerce Nov. 2, 2017) (affirmative preliminary determination

of sales at less-than-fair value and postponement of final determination) (citing

Commerce's China's Status Non-Market Economy Mem. (Oct. 26, 2017)),

unchanged in Certain Aluminum Foil from the People's Republic of China, 83

Fed. Reg. 9282 (Dep't of Commerce Mar. 5, 2018) (final determination of sales at

less than fair value); see also 19 U.S.C. § 1677b(c).  When a proceeding concerns a

non-market economy, the statute generally requires Commerce to determine

normal value based on the factors utilized to produce the subject merchandise,

including raw materials, labor, and utilities, and general expenses and profit, plus

the cost of containers, coverings, and other expenses.  19 U.S.C. § 1677b(c)(1).

These factors of production in non-market economy cases are based on data from a

surrogate market economy country or countries.  See id. § 1677b(c)(4).  Pursuant

to 19 C.F.R. § 351.408(c)(2), Commerce will normally value factors of production

using data from a single surrogate country.  19 C.F.R. § 351.408(c)(2); see Non-

Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (Dep't

of Commerce Mar. 1, 2004).

After granting separate-rate status to Linyi Chengen,[4] Commerce turned to

the surrogate country issue.  When selecting a value for a given factor of

production, § 1677b(c) requires Commerce to use the "best available information."

See 19 U.S.C. § 1677b(c)(1); see, e.g., Nation Ford Chem. Co. v. United States

("Nation Ford"), 166 F.3d 1373, 1377 (Fed. Cir. 1999).  Provided that Commerce

uses the best available information and determines the antidumping duty margin as

accurately as possible, Commerce has discretion over what factors of production

methodology is "best" for a given situation.  See Nation Ford, 166 F.3d at 1378

(section 1677b(c) "does not require that a uniform methodology be used in the

valuation of all relevant factors"); Ningbo Dafa Chem. Fiber Co. v. United States,

580 F.3d 1247, 1261 (Fed. Cir. 2009) (Commerce enjoys broad discretion in

valuing factors of production).  Because the proceeding involved a non-market

economy country, Commerce was required to determine the subject merchandise's

normal value by relying on the "best available information" from a market

economy country meeting certain criteria.

For this proceeding, Commerce's list of countries that are economically

comparable to China, based on 2018 gross national income data, included Brazil,

---

[4]  In non-market economy proceedings, Commerce applies a rebuttable
presumption that all exporters and producers are controlled by the government.
See, e.g., China Mfrs. All., LLC v. United States, 1 F.4th 1028, 1030–31, 1039
(Fed. Cir. 2021).

Bulgaria, Malaysia, Mexico, Russia, and Turkey.  <u>See</u> Commerce's Letter to

Interested Parties Requesting Economic Development, Surrogate Country, and

Surrogate Value Comments and Information (Aug. 16, 2019) at 1, Attachment at

1–2, PR 98 (containing the list of surrogate countries for antidumping

investigations and reviews from China).

  Linyi Chengen argued that data from Romania should be used, which was

not on the surrogate country list.  Linyi Chengen's Comments Surrogate Country

List Primary Surrogate Country (Aug. 23, 2019) at 1–2, PR 101.  The Coalition for

Fair Trade in Hardwood Plywood ("Coalition") provided data for Malaysia, among

others.  Coalition's Comments Surrogate Country Selection (Aug. 23, 2019) at 2,

PR 102.

## II. Preliminary Determination

  In the <u>Preliminary Results</u>, Commerce selected Malaysia as the primary

surrogate country because Malaysia was at a comparable level of economic

development to China, was a significant producer of comparable merchandise, and

its data constituted the best available data for valuing Linyi Chengen's factors of

production.  Prelim. IDM at 14–15.  In addition, Commerce determined

preliminarily that the Malaysian data were superior with respect to the breadth of

available financial statements from producers of comparable merchandise, whereas

the Romanian data included only one financial statement.  <u>See</u> <u>id.</u> at 16.

Another threshold issue was the methodology to use for valuing Linyi
Chengen's log inputs.  In some circumstances, Commerce will calculate normal
value by applying a surrogate value to an intermediate input rather than valuing the
individual factors of production used to produce that intermediate input.  The
Parties refer to this as "intermediate input methodology."  See Final IDM at 8–19;
see also Zhengzhou Harmoni Spice Co. v. United States, 33 CIT 453, 460–66, 617
F. Supp. 2d 1281, 1291–95 (2009) (explaining that Commerce employs the
intermediate input methodology within the statutory framework because the "best
way to value the factors of production used to produce an intermediate product . . .
is through the direct valuation of that intermediate input").

As a result of the antidumping investigation into certain hardwood plywood
products from China, Commerce issued its final affirmative determination in that
proceeding in November 2017.  See Investigation, 82 Fed. Reg. at 53,460 and
accompanying issues and decision memorandum dated November 6, 2017
("Investigation IDM"), Court No. 18-00002, PD 871.  In the Investigation,
Commerce calculated Linyi Chengen's margin based on its intermediate input—
veneers.  See Investigation IDM at 23.  The decision to apply the intermediate
input methodology was due to inconsistencies discovered at verification during the
investigation with respect to Linyi Chengen's reported information.  See Final
IDM at 14; Investigation IDM at 23–25.  During the investigation, Commerce

considered Linyi Chengen's reporting of the log quantity to be "imprecise" based

on observations made at verification, such as how the suppliers marked and

measured the log diameter, how the production manager verified the log supply

through spot checks, and whether Linyi Chengen used the "Chinese National

Standard" conversion table, a table that results in a volume in excess of the volume

of the simple cylinder that is necessary for the log-to-veneer peeling process.[5]

Investigation IDM at 24–25.  In particular, Commerce was concerned that the

formula Linyi Chengen used to calculate the volume of its reported log

consumption only relied on the narrow end of the log and that the total volume of

logs purchased and reported in Linyi Chengen's records was calculated by Linyi

Chengen itself.  See Final IDM at 14; see also Investigation IDM at 24–25.

Linyi Chengen appealed that determination, among other appealed issues.

The Court remanded for further explanation of Commerce's intermediate input

methodology reasoning.  Linyi Chengen Imp. and Exp. Co., Ltd. v. United States

("Linyi Chengen I"), 43 CIT __, __, 391 F. Supp. 3d 1283, 1295 (2019).  The

Court deemed Commerce's explanation in the remand results to be inadequate.

---

[5] Cf. Linyi Chengen's Supp. Section D Questionnaire Resp. (Dec. 2, 2019) ("Linyi Chengen's SDQR") at 10–12, PR 148, with Linyi Chengen Imp. and Exp. Co., Ltd. v. United States, 43 CIT __, __, 391 F. Supp. 3d 1283, 1289 (2019) ("Commerce considered Linyi Chengen's reporting of the log quantity to be 'imprecise' based on observations made at verification, such as . . . whether Linyi Chengen used the Chinese National Standard conversion table" (citation omitted)).

Linyi Chengen Imp. and Exp. Co., Ltd. v. United States, 44 CIT __, __, 433 F.

Supp. 3d 1278, 1284–86 (2020) ("Linyi Chengen II").  Commerce's investigation

had revealed "no discrepancies" in Linyi Chengen's documentation; therefore, the

Court held that Commerce's determination that Linyi Chengen's documentation

was unreliable for lack of third-party confirmation was unsupported by substantial

evidence and otherwise contrary to law.  Id. at __, 433 F. Supp. 3d at 1286.  On

further remand of the case, Commerce reversed its determination to apply the

intermediate input methodology to Linyi Chengen in the investigation.  See Final

Results Redetermination Pursuant Court Remand (Jun. 18, 2020), Court No. 18-

00002, ECF No. 114.  This redetermination was sustained.  Linyi Chengen Imp.

and Exp. Co., Ltd. v. United States, 44 CIT __, 487 F. Supp. 3d 1349 (2020)

("Linyi Chengen III").

    In this first administrative review, Linyi Chengen reported in its initial

questionnaire responses how its purchases of logs were transacted and invoiced,

and how it calculated the log volumes using the Chinese National Standard.  Final

IDM at 14 (citing Linyi Chengen's Sections C and D Questionnaire Resp. (Jul. 23,

2019) ("Linyi Chengen's CDQR") at D6–D7, Ex. 11, PR 90).  In a supplemental

questionnaire response, Linyi Chengen demonstrated how the Chinese National

Standard formula accounts for the taper coefficient of the log (i.e., the difference

between the narrow end of a log and the wider end) and calculates a volume in

excess of the volume of a simple cylinder.  <u>See</u> Linyi Chengen's Supp. Section D
Questionnaire Resp. (Dec. 2, 2019) ("Linyi Chengen's SDQR") at 10–12, PR 148.
Linyi Chengen also demonstrated how the formula results in the largest log volume
when compared to two other formulae detailed in the U.S. Department of
Agriculture ("USDA") Forest Service's General Technical Report: A Collection of
Log Rules ("USDA Technical Report"), one of which was described as "one of the
three cubic volume formulae most commonly used in forest mensuration research."
<u>Id.</u> at 15–16; <u>see also</u> Final IDM at 14; Linyi Chengen's CDQR at D6–D7 at Ex.
12; USDA Technical Report at 44.

     Using this information, Commerce preliminarily calculated Linyi Chengen's
normal value using its normal methodology rather than the intermediate input
methodology.  Prelim. IDM at 20–21.  In those results, Commerce stated that it
intended to "conduct a verification of the accuracy of [Linyi] Chengen's log
volume calculation, its reported consumption rates, and its sales and accounting
documentation" in accordance with 19 U.S.C. § 1677m(i)(3)(B) because
Commerce found "that the disagreement between interested parties with respect to
such a fundamental component of our calculation, <u>i.e.</u>, whether to value the
respondent's actual [factors of production] or intermediate input, constitutes good
cause for verification."  <u>Id.</u> at 21.

Other relevant preliminary determinations are as follows.  To value Linyi Chengen's birch and poplar log inputs, the Coalition placed Malaysian import data on the record, specifically the Malaysian Global Trade Atlas ("GTA") data.  See Coalition's Submission of Surrogate Values (Sept. 13, 2019) ("Coalition's Surrogate Value Comments"), PR 109–15.  Linyi Chengen also placed Malaysian import data, the United Nations International Trade Statistics Database ("UN Comtrade") data, and Romanian import data on the record.  See Linyi Chengen's Final Surrogate Value Comments (Jan. 2, 2020) at Ex. SV2-1, PR 150–53; see also Linyi Chengen's Prelim. Surrogate Value Submission (Sept. 13, 2019) ("Linyi Chengen's Prelim. Surrogate Values") at Ex. SV-2, PR 105–08.  Commerce preliminarily determined that the Malaysian GTA data were the best available information to value Linyi Chengen's log inputs because the data were reported in cubic meters, as were Linyi Chengen's factors of production, and the GTA data were based on the ten-digit Harmonized Tariff Schedule ("HTS") categories. Prelim. IDM at 18–19.  Therefore, Commerce preliminarily valued Linyi Chengen's log inputs using Malaysian GTA import data for HTS categories 4403.97.10.00 and 4403.95.10.00.  Id.

To value labor, Commerce preliminarily used wage data from the Malaysia Department of Statistics ("MDS").  See Commerce's Prelim. Surrogate Value Mem. (Jan. 31, 2020) at Attachment 9, PR 167; see also Linyi Chengen's Rebuttal

Surrogate Values at Ex. SVR-4, PR 120.  The record also contained

manufacturing-specific Malaysian wage data from "Trading Economics –

Malaysia."  See Coalition's Surrogate Value Comments at Ex. M-3.  Commerce

calculated the labor surrogate value by first dividing the total wages earned over

the period of review by the total number of employees to derive an average

monthly wage and then dividing that figure by the number of working days per

month and the number of hours in a working day.  See Commerce's Prelim.

Surrogate Value Mem. at Ex. 9.  Commerce's calculation had assumed 21 working

days per month.

 To value the formaldehyde input used by Linyi Chengen to make the glue

that holds its plywood layers together, see Linyi Chengen's CDQR, the Parties

placed on the record GTA data for Malaysia falling under the six-digit HTS

category 2912.11, which is defined as "Methanal (formaldehyde)."  See Linyi

Chengen's Rebuttal Surrogate Values at Ex. SVR-3.  Included under that six-digit

subheading are certain ten-digit HTS subcategories: (1) HTS 2912.11.10.00,

defined as "Formalin;" and (2) HTS 2912.11.90.00 defined as "Other."

 Linyi Chengen clarified its formaldehyde input as formalin in its surrogate

rebuttal comments.  See id. at Exs. SVR-1 and SVR-2.  According to Linyi

Chengen's documentation, formalin must contain 40 percent formaldehyde by

volume or 37 percent by mass.  Id. at Ex. SVR-2.  For the Preliminary Results,

Commerce valued Linyi Chengen's formaldehyde using GTA data in HTS

subheading 2912.11.10, which is specific to "formalin." <u>See</u> Commerce's Prelim.

Surrogate Value Mem. at Attachment 1.

      To calculate surrogate financial ratios in the <u>Preliminary Results</u>, Commerce

selected four out of seven potential financial statements from Malaysian producers.

Prelim. IDM at 17–18. Specifically, Commerce selected the Focus Lumber Berhad

("Focus Lumber") statements from the Coalition's Surrogate Value Comments, Ex.

10, and also the financial statements for Fu Yee Corporation Sdn. Bhd. ("Fu Yee"),

Megamas Plywood Sdn. Bhd. ("Megamas"), and Ta Ann Plywood Sdn. Bhd ("Ta

Ann") from Linyi Chengen's Final Surrogate Value Comments, Ex. 3 (Fu Yee

statements), Ex. 5 (Megamas statements), and Ex. 8 (Ta Ann statements),

respectively. <u>Id.</u> at 17–18. Commerce's evaluation indicated that the statements

for these companies all demonstrated that they were primarily engaged in the

production and sale of plywood, with between 79.8 and 99 percent of sales revenue

being generated through sales of plywood. <u>Id.</u> at 18.

## II.    Administrative Case Briefs and <u>Final Results</u>

      With the issue of input methodology still unsettled, on April 6, 2020, during

the early stages of the COVID-19 global pandemic, Commerce issued a case

briefing schedule noting that it still intended to conduct verification of Linyi

Chengen's reported information "when the conditions allow," and that Commerce

would issue a separate briefing schedule for issues arising from verification after

the release of any verification report.  See Commerce' Briefing Schedule Mem.

(Apr. 6, 2020), PR 180.  Afterward, on April 23, 2020, Commerce suspended the

deadline for case and rebuttal briefs indefinitely in response to a request from the

petitioner to extend the deadline for case brief issues related to Linyi Chengen until

verification was either cancelled or completed.  See Commerce's Suspension

Briefing Schedule Mem. (Apr. 23, 2020), PR 182.  On June 15, 2020, in light of

the "Global Level 4 travel advisory" preventing Commerce personnel from

traveling abroad due to the COVID-19 pandemic, Commerce cancelled

verification.  See Commerce' Cancellation Verification Establishment Briefing

Schedule Mem. (Jun. 15, 2020), PR 186.  Commerce explained that because

"verification is not possible under the current conditions, and statutory deadlines

prevent us from issuing a supplemental questionnaire or postponing the final

results any further, we are relying on the information submitted on the record for

the Preliminary Results, as facts available in reaching our final results."  See id. at

7; Final IDM at 7.

        Commerce then received administrative case briefs and rebuttal briefs from

the Coalition, Linyi Chengen, and an importer coalition consisting of, among

others, Taraca Pacific Inc., Richmond International Forest Products LLC, and

Concannon Corporation (collectively, "Taraca").  In its administrative case brief,

the Coalition argued that verification was necessary, as there were disagreements regarding a fundamental aspect of the margin calculation, namely the use of the intermediate input methodology, and that Commerce should postpone the final results in order to either conduct on-site verification or issue an additional supplemental questionnaire to Linyi Chengen.  <u>See</u> Coalition's Resubmission Case Br. (Nov. 13, 2020) ("Coalition's Case Br."), PR 208  The Coalition argued that Commerce should use the intermediate input methodology because of alleged issues with documentation that Linyi Chengen supplied for its log factors of production.  <u>See</u> <u>id.</u> at 9–33.

Linyi Chengen and Taraca opposed the Coalition's position and supported Commerce's calculation of Linyi Chengen's normal value based on Commerce's standard methodology.  <u>See</u> Linyi Chengen's Case Brief (Jun. 29, 2020) ("Linyi Chengen's Case Br."), PR 190; <u>see also</u> Taraca's Letter in Lieu Case Brief (Jun. 29, 2020) ("Taraca's Case Br."), PR 189.  Linyi Chengen and Taraca argued that Commerce should not postpone the final results, that Commerce had discretion whether to conduct a verification, that the significant evidence on the record supported the use of Linyi Chengen's actual log purchase data, that absent evidence warranting use of the intermediate input method the cancellation of verification should not be a reason for Commerce to deviate from its normal methodology for valuing Linyi Chengen's log factor of production data, that Linyi

Chengen has not changed its production or accounting methodology since the last

verification, and that the problem the Coalition identified had been addressed by

the substantial questionnaire responses of Linyi Chengen.  See Linyi Chengen's

Case Br.; Taraca's Case Br.

For the Final Results, Commerce continued to select Malaysia as the

primary surrogate country.  Final IDM at 26.  No party challenges Commerce's

surrogate country selection.

Regarding log input methodology, Commerce continued to calculate Linyi

Chengen's normal value based on its standard or normal methodology rather than

the intermediate methodology.  See id. at 13–19.

Regarding Linyi Chengen's log factors of production, Commerce's selection

of Malaysian GTA import data for HTS categories 4403.97.10.00 and

4403.95.10.00 as surrogates remained unchanged for the Final Results.  Id. at 25–

28.

Regarding labor, based on further examination of the Malaysian Department

of Statistics wage data, Commerce concluded in the Final Results that use of this

data would lead to an inaccurate result and therefore determined that the "Trading

Economics – Malaysia" data were the best available information to value

Chengen's labor factors of production.  Id. at 31–32.  Commerce also "corrected"

its preliminary calculation, which had assumed 21 working days per month instead

of 24, which is Commerce's stated practice.  See id. at 31 (citing Antidumping

Methodologies in Proceedings Involving Non-Market Economies: Valuing the

Factor of Production: Labor, 76 Fed. Reg. 36,092, 36,094 (Dep't of Commerce

Jun. 21, 2011)).

Regarding the formaldehyde input, upon further review, Commerce

determined in the Final Results that the record did not support Linyi Chengen's

assertion that its input was formalin.  Id. at 30.  Thus, Commerce averaged the two

ten-digit categories (HTS 2912.11.10.00 "Formalin" and HTS 2912.11.90.00

"Other") to value Linyi Chengen's formaldehyde input.  Id.

Regarding the surrogate financial ratios, the Coalition opposed Commerce's

reliance upon the Fu Yee and Ta Ann financial statements to calculate surrogate

financial ratios.  See id. at 19–20.  For the Final Results, Commerce continued to

select the financial statements of Fu Yee and Ta Ann, in addition to Focus Lumber,

as the best available information on the record to calculate the surrogate financial

ratios.  Id. at 21.  Commerce determined not to select the Megamas financial

statements because the auditor's report for the company included a note of material

uncertainty.  Id.  Specifically, the report identified that Technical Note 4 in the

financial statements indicated that the company recorded negative operating cash

flows of RM164,274 during the financial year ending December 31, 2018, and that

as of that date the company recorded a deficit in its equity and the company's

liabilities exceeded its current assets.  See id. at 21–22 (citing Linyi Chengen's

Final Surrogate Value Comments at Ex. SV2-5).  The auditor's note concluded that

these conditions "indicate that a material uncertainty exists that may cast

significant doubt on the Company's abilities to continue as a going concern."  See

id.  As a result of the concern raised by the auditor with respect to Megamas and

because other usable financial statements were available on the record to calculate

the surrogate financial ratios, Commerce declined to include the Megamas

financial statements in the surrogate financial ratio.  Id. at 21–22.

For the Final Results, Commerce calculated a weighted-average dumping

margin of 14.95 percent for Linyi Chengen; Commerce also applied Linyi

Chengen's weighted-average dumping margin of 14.95 percent as the rate for all

unexamined separate rate respondents.  See Final Results, 85 Fed. Reg. at 77,159.

## III.    Appeal to CIT

Plaintiffs and Consolidated Plaintiffs commenced multiple actions in the

U.S. Court of International Trade to contest Commerce's final determination.  The

Court consolidated the cases on March 3, 2021.  See Order (Mar. 3, 2021), ECF

No. 26.  Before the Court are three motions for judgment on the agency record

filed pursuant to USCIT Rule 56.2.

The Coalition submitted a Rule 56.2 motion for judgment on the agency

record.  See Pl.'s Rule 56.2 Mot. J. Agency R., ECF Nos. 32, 33; see also Pl.'s

Consol. Court No. 20-03930                                                  Page 22

Mem. Supp. Pl.'s Rule 56.2 Mot. J. Agency R. ("Coalition's Br."), ECF Nos. 32-2,

33-2; Pl.'s Reply Br. ("Coalition's Reply"), ECF Nos. 43, 44.  The Coalition raises

two challenges in its motion for judgment on the agency record: (1) Commerce's

calculation of the dumping margin for Linyi Chengen without using the

intermediate input methodology, and (2) Commerce's calculation of the surrogate

financial ratio using data for Fu Yee and Ta Ann.[6]  Coalition's Br. at 17–31, 35–

41.

Defendant-Intervenor Linyi Chengen Import and Export Co., Ltd. and

Consolidated Plaintiffs Xuzhou Jiangheng Wood Products Co., Ltd. and Xuzhou

Jiangyang Wood Industries Co., Ltd. (collectively, "Linyi Chengen") also

submitted a Rule 56.2 motion for judgment on the agency record.  See Linyi

Chengen's Rule 56.2 Mot. J. Agency R., ECF No. 31; see also Linyi Chengen's

Rule 56.2 Mem. Supp. Mot. J. Agency R. ("Linyi Chengen's Br."), ECF No. 31-2;

Linyi Chengen's Reply Br. ("Linyi Chengen's Reply"), ECF No. 41.  Linyi

Chengen raises three issues that pertain to Commerce's selection of surrogate

values for (1) birch and poplar logs, (2) labor, and (3) formaldehyde.  Linyi

Chengen's Br. at 1–11.

---

[6]  The Coalition raised a third claim in its initial brief to challenge Commerce's
assumption of 24 working days per month instead of 21 as was done in the
preliminary determination, but appears to have abandoned that claim without
further comment.  Pl.'s Br. at 32–35; see generally Coalition Reply.

Consol. Court No. 20-03930                                                    Page 23

Consolidated-Plaintiffs Richmond International Forest Products LLC,

Taraca Pacific Inc. and Concannon Corporation (collectively, "Taraca") also

submitted a Rule 56.2 motion for judgment on the agency record.  See Taraca's

Rule 56.2 Mot. J. Agency R., ECF No. 30; see also Taraca's Mem. Supp. Rule

56.2 Mot. J. Agency R. ("Taraca's Br."), ECF No. 30-1; Taraca's Reply Br.

("Taraca's Reply"), ECF No. 42.  The motion incorporates by reference the

arguments made by the other separate rate respondents challenging the dumping

rate calculated for Linyi Chengen and the separate rate in their respective Rule

56.2 motions.  Taraca's Br. at 1, 17.  Taraca raises four issues specifically:

(1) Commerce's exclusion of the financial statements of Megamas (i.e., Megamas

Plywood Sdn. Bhd.) from the calculation of surrogate financial ratios;

(2) Commerce's reliance on Malaysian GTA data to derive the surrogate value for

Linyi Chengen's log inputs instead of relying on the UN Comtrade data under the

six-digit U.S. HTS subheadings 4403.97 and 4403.95; (3) Commerce's reliance on

the average of data for HTS 2912.11.10 and HTS 2912.11.90 to derive the

surrogate value for Linyi Chengen's formaldehyde input, arguing that the best

available information and most specific data for Linyi Chengen's actual

formaldehyde input was the import data reported under the HTS subheading

2912.11.10; and (4) Commerce's separate rate calculation, which Taraca contends

was incorrect because Commerce assigned the erroneous dumping margin

calculated for Linyi Chengen, the sole mandatory respondent, to the separate rate respondents.  Id. at 9–17.

The Coalition opposes Taraca's and Linyi Chengen's Motions for Judgment on the Agency Record.  See Pl.'s Resp. Br. ("Coalition's Resp."), ECF Nos. 37, 40. Taraca, and Linyi Chengen (as Defendant-Intervenors), oppose the Coalition's Motion for Judgment on the Agency Record.  See, e.g., Taraca's Resp. Opp'n Coalition's Mot. J. Agency R. ("Taraca's Resp."), ECF No. 34; Linyi Chengen's Resp. Br. ("Linyi Chengen's Resp."), ECF Nos. 38, 39.  Defendant United States ("Defendant") argues for sustaining the Final Results as is, in opposition to all Motions for Judgment on the Agency Record.  See Def.'s Resp. Pls.' Rule 56.2 Mots. J. Agency R. ("Def.'s Resp."), ECF Nos. 35, 36.

## STANDARD OF REVIEW

The Court has jurisdiction under 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c), which grant the Court authority to review actions contesting the final results of an administrative review of an antidumping duty order.  The Court shall hold unlawful any determination found to be unsupported by substantial evidence on the record or otherwise not in accordance with the law. 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

Regarding the Parties' three separate Rule 56.2 motions for judgment on the agency record, the Court addresses the issues raised as follows.

### I.      Log Inputs

#### A.      Input Methodology

As described above, in the less than fair value investigation, Commerce relied on the "intermediate input methodology," which resulted in values placed on Linyi Chengen's veneer consumption rather than the logs consumed to produce the veneers.  See Prelim. IDM at 19.  For this administrative review, Commerce concluded that departing from its preferred methodology of valuing the actual inputs consumed by Linyi Chingen to produce subject merchandise was not warranted.  Final IDM at 19.  Commerce thus accepted Linyi Chengen's log consumption calculations as reported.  See id.  The Coalition contests the use of this preferred methodology in calculating Linyi Chengen's dumping margin rather than the intermediate input methodology.  Coalition's Br. at 17–31.  The issue that the Coalition ultimately contests is the relative uncertainty of surrogate valuations, based on either logs or veneers.

The Coalition argues that substantial evidence on the record not only demonstrates that Linyi Chengen's veneer consumption data were the best available information for calculating normal value, but that Linyi Chengen's log

factors of production cannot be considered the best available information, and that Commerce did not adequately explain or address its arguments on why veneer consumption data were not the best available information or why log consumption data were the best available information given its inherent flaws. Id. at 20–23. The Coalition also contends that Commerce's cancellation of verification and Commerce's determination on the record as developed to rely on Linyi Chengen's log factors of production without conducting any type of verification, further questioning Linyi Chengen's data, or explaining why verification was no longer necessary, were arbitrary and capricious in light of Commerce's preliminary determination that verification was necessary. Id. at 29–31.

## 1.   Verification

Addressing the issue of verification first, Commerce stated in the Preliminary Results that it:

> intends to conduct a verification of the accuracy of [Linyi] Chengen's log volume calculation, its reported consumption rates, and its sales and accounting documentation, in accordance with section 782(i)(3)(B) of the Act, [19 U.S.C. § 1677m(i)(3)(B),] because we find that the disagreement between interested parties with respect to such a fundamental component of our calculation, i.e., whether to value the respondent's actual [factors of production] or intermediate input, constitutes good cause for verification.

Prelim. IDM at 21; see Final IDM at 7.

For the Final Results, Commerce explained that due to the "Global Level 4

travel advisory" (see U.S. Department of State website) and statutory deadlines for

the review, "for reasons beyond [Commerce's] control," it intended to rely on the

information as submitted.  Final IDM at 7.

The Coalition contests Commerce's position to not conduct a verification,

explaining that "it is inaccurate to say that Commerce had no concerns regarding

[Linyi] Chengen's reporting" given Commerce's determination that it needed "to

conduct a verification of the accuracy of [Linyi] Chengen's log volume

calculation, its reported consumption rates, and its sales and accounting

documentation[.]"  Coalition's Reply at 3 (quoting Prelim. IDM at 21).  The

Coalition complains that while Commerce ultimately did not conduct verification,

the decision was not based on a finding that verification was no longer necessary.

Id. at 4 (referencing Final IDM at 7).

The Court agrees with the Coalition that the fact that Commerce relied on

facts available for its final determination because information could not be verified

is indication that the agency understood that verification was "needed."  See id.

Nonetheless, Congress intended for 19 U.S.C. § 1677e(a)(1) (determinations on the

basis of facts available) to provide a work-around in situations such as this, where

verification was precluded due to a "Global Level 4 travel advisory."  Cf.

Statement of Administrative Action, H.R. Rep. No. 103-316, at 869 (1994)

("where requested information is missing from the record"), as reprinted in 1994

U.S.C.C.A.N. 4040, 4198.  An interested party cannot expect that Commerce

would not adopt a different approach in determining the final results.  Id.  The

Court has sustained Commerce's change in its stance on issues decided

preliminarily in its final determinations if Commerce explains the reasoning for the

change and "its decision is supported by substantial evidence and in accordance

with law."  E.g., Hyundai Steel Co. v. United States, 42 CIT __, __, 319 F. Supp.

3d 1327, 1343 (2018) (citing Timken Co. v. United States, 23 CIT 509, 515, 59 F.

Supp. 2d 1371, 1376 (1999)).  In light of the statutory deadlines and the disruption

of travel due to the COVID-19 pandemic that precluded Commerce officials from

conducting an on-site visit to Linyi Chengen's facilities, the Court concludes that

Commerce's decision not to conduct verification was reasonable.[7]

## 2.    Choice of Methodology

Turning to the substantive issue of choice of input methodology, Commerce

adhered to its preference of valuing the actual inputs used by a respondent in the

production of subject merchandise instead of applying the intermediate input

---

[7]  19 U.S.C. § 1677m(i) requires verification in the case of (1) a final determination
in an investigation, (2) a determination to revoke a trade order, or (3) if requested,
and no verification has occurred during the two immediately preceding
administrative reviews.  19 U.S.C. § 1677m(i).  Commerce's preliminary decision
to verify in this instance was made under the permissive "good cause" authority of
subsection (3) (i.e., verification was not mandatory in this instance).

methodology.  Final IDM at 19.  Adherence to administrative preference is

evaluated for reasonableness on the record presented.  See, e.g., Jiaxing Bro.

Fastener Co., Ltd. v. United States, 822 F.3d 1289, 1302 (Fed. Cir. 2016)

(upholding use of Thai import statistics in accordance with administrative

preference to appraise surrogate values from a single surrogate country); Diamond

Sawblades Mfrs.' Coal. v. United States, 45 CIT __, __, 547 F. Supp. 3d 1323,

1332 (2021) (reasonable to rely on Thai data absent evidence of aberrancy);

Changzhou Trina Solar Energy Co. v. United States, 44 CIT __, __, 450 F. Supp.

3d 1301, 1315 (2020) (use of unconsolidated financial statements held reasonable

to adhere to administrative preference for information from producers of identical

or comparable merchandise in the surrogate country); Atar S.R.L. v. United States,

730 F.3d 1320, 1329 (Fed. Cir. 2013) (evaluating reasonableness of agency method

of calculating constructed value profit cap under § 1677b(e)(2)(B)(iii)).

     Commerce explained that because Linyi Chengen disclosed the facts that

were cause for concern in the investigation early in this review, it was able to

request detailed supplemental information and documentation regarding the

Chinese National Standard and Linyi Chengen's practice of providing purchase

invoices to its suppliers of poplar logs.  Final IDM at 19.  Noting its second

remand of the investigation that had included a similar analysis of the log volumes

of various sizes, calculated using the Chinese National Standard and calculated

using the formula for the volume of a simple uniform cylinder,[8] Commerce

concluded based on the resultant volumes of its analysis in this review that the

difference between the two volumes was attributable to the taper coefficient

accounted for by the Chinese National Standard and the amount of wood that

would need to be removed from a log until it is a uniform cylinder and more

suitable for the rotary peeling process.  Id. at 17.

As in the Investigation, for this administrative review Linyi Chengen's

"actual" log input factors of production are derived from the documentation it

maintained for its veneer consumption, since Linyi Chengen does not maintain

documentation of actual production of veneers from logs.  See, e.g., id. at 12 (Linyi

Chengen stating that log factors of production "are calculated according to log

consumption and veneer production quantities"); Coalition's Br. at 21.  "In other

words, the starting point for [Linyi] Chengen's log [factors of production] was the

documentation [it] maintained for its veneer consumption, not regarding its

production of veneers from logs."  Coalition's Reply at 5 (emphasis in original);

see id. at 6 ("the operative fact is that [Linyi] Chengen has [bills of materials]

detailing veneer consumption but does not have [bills of materials] detailing veneer

consumption but does not have [bills of materials] (or other similar documentation)

---

[8]  The volume of a simple uniform cylinder (V) is equal to the product of $2\pi$, the
radius of the cylinder's base(r), and the cylinder's length(l) (V=$2\pi$rl).

detailing log consumption"). The log factors of production were thus "backed

into" by being based on overall consumption and production records that relate to

the veneer factors of production, which in turn are based on product-specific

information reported in bills of materials in the normal course of business. See

Linyi Chengen's CDQR at Exs. D-2.1–D-2.4; Linyi Chengen's SDQR at Ex. SQ3-

17. Because of this fact, the Coalition argues that Commerce's explanation fails to

adequately address its arguments regarding the veneer consumption data as

superior to the log consumption data and that it was unreasonable for Commerce

not to resort to the intermediate input methodology as Commerce had during the

investigation. Coalition's Br. at 17–29. The Coalition contends that Commerce's

recitation of Linyi Chengen's documented information does not equate to

information about the production of veneers from logs, nor does it demonstrate that

the log documentation is equivalent or preferable to the veneer documentation. Id.

at 21–23. According to the Coalition, the relatively sparse documentation

supporting Linyi Chengen's log consumption can be cured by relying on Linyi

Chengen's veneer factors of production. See id. The Coalition argues that

substantial evidence of record not only demonstrates that Linyi Chengen's veneer

consumption data were the best available information for calculating Linyi

Chengen's normal value but also that its log factors of production cannot be

considered the best available information. See id. at 20–29.

Commerce accepted Linyi Chengen's construction, based on record

evidence showing purchases from its suppliers and what its log factors of

production amounted to, and Commerce discerned no information on the record

that would cast doubt on that reported information.  Final IDM at 19.  Defendant

explains that the only circumstances in which Commerce has applied intermediate

input methodology are: (1) when the factors of production for the intermediate

input accounts for an insignificant share of the total output, and the burden

associated with valuing each factor of production outweighs the potential increase

of calculation accuracy in such an analysis, and (2) when valuing the factors of

production associated with producing the intermediate input would result in

inaccurate calculations because Commerce is not able to value a significant cost in

the overall factors buildup.  Def.'s Resp. at 16–17 (referencing Final IDM at 23;

Frozen Fish Fillets from Vietnam, 68 Fed. Reg. 37,116 (Dep't of Commerce Jun.

23, 2003) (notice of final antidumping duty determination of sales at less than fair

value and affirmative critical circumstances) and accompanying issues and

decision memorandum at cmt. 3; Honey from China, 71 Fed. Reg. 34,893 (Dep't

of Commerce Jun. 16, 2006) (final results and final rescission, in part, of

antidumping duty administrative review) and accompanying issues and decision

memorandum at cmt. 9; Fresh Garlic from China, 71 Fed. Reg. 26,329 (Dep't of

Commerce May 4, 2006) (final results and partial rescission of antidumping duty

administrative review and final results of new shipper review) and accompanying

issues and decision memorandum at cmt. 1).  The first circumstance is not

implicated here, as it appears undisputed that logs are a significant share of the

output of plywood.  Regarding the second circumstance (valuing the log factors of

production), Commerce did not find problematic Linyi Chengen's method of

calculating quantities by applying its log consumption ratio to the veneer factors of

production.

The Court observes that Commerce supported its determination to accept

Linyi Chengen's reported calculation of logs consumed during the period of review

rather than basing normal value on veneer consumption, based on evidence of

Linyi Chengen reporting in its initial questionnaire responses how its purchases of

logs were transacted and invoiced and how the log volumes were calculated using

the Chinese National Standard.  Final IDM at 14 (citing Linyi Chengen's CDQR at

D6–D7 and Ex. 11).  Linyi Chengen also provided the USDA Technical Report

discussing the various U.S. standards for calculating the volume of logs and the

European Union standard for measuring the volume of round timber, noting that a

number of the various formulae rely on a measurement from the narrow end of the

log.  Id. at 14; Linyi Chengen's CDQR at D6–D7, Exs. 12 (USDA Technical

Report) and 13.  Linyi Chengen demonstrated in a supplemental questionnaire

response how the Chinese National Standard formula accounts for the taper

Consol. Court No. 20-03930                                    Page 34

coefficient of the log (i.e., the difference between the narrow end of a log and the

wider end) and calculates a volume in excess of the volume of a simple cylinder.

See Linyi Chengen's SDQR at 10–12.  Linyi Chengen demonstrated how the

formula results in the largest log volume when compared to two other formulae

detailed in the USDA Technical Report, one of which was described as "one of the

three cubic volume formulae most commonly used in forest mensuration research."

Id. at 15–16; see also USDA Technical Report at 44.  Commerce stated in the Final

IDM that this additional information resolved its concerns from the investigation

that Linyi Chengen's calculation of its log consumption was inaccurate because its

formula relied on the narrow end of the log.  Final IDM at 13–14.  Commerce

noted that Linyi Chengen provided additional evidence regarding its material

purchase records, clarifying questions Commerce had made about those records at

verification during the investigation.  Id.  Specifically, Linyi Chengen explained

that Chinese regulations stipulate that the purchaser of certain agricultural products

issue tax invoices on behalf of the sellers.  See Linyi Chengen's CDQR at D6, Ex.

10.

Defendant's position is that Linyi Chengen provided facts for the record

sufficiently early in the review to address Commerce's prior concerns from the

investigation, which had resulted from the discovery of new information at

verification.  Final IDM at 19.  Commerce noted that Linyi Chengen's cooperation

during this review enabled Commerce to request detailed supplemental information

and documentation regarding the Chinese National Standard and Linyi Chengen's

practice of providing purchase invoices to its suppliers of poplar logs. Id. (citing

Linyi Chengen's SDQR at 5–17). Commerce also requested a significant amount

of supplemental documentation, clarification, and explanation for this review

regarding purchaser-issued tax invoices on behalf of sellers, which Linyi Chengen

provided in a timely manner. See Linyi Chengen's SDQR at 5–9, Exs. 7–10.

Linyi Chengen also provided a sample "delivery sheet" from the period of review

provided by its suppliers of poplar logs, and the corresponding warehouse journal

and warehouse-in slip. Id. at 16–17, Ex. 12.

        In further support of its preferred input methodology, Commerce also

reviewed information from the investigation placed on the record of this review.

That information showed that during verification at the time of the investigation,

Commerce verifiers examined Linyi Chengen's log consumption and veneer

production records supporting its log factors of production, including its log

warehouse journals and supporting log warehouse-in tickets, log purchase value-

added tax invoices and corresponding accounting vouchers, log raw material

ledgers, log supplier account payable sub-ledgers, bank payment slips, log

warehouse out slips, semi-finished goods cost of production ledgers, veneer

production record reports, veneer warehouse journals and supporting veneer

warehouse-in tickets, and self-made semifinished product ledgers.  See Coalition's

Letter Placing Info. Investigation R. Admin. Rev. (Sept. 24, 2019), at Ex. 3.2

("Investigation Verification Report" at Ex. 26), PR 122–132.  Commerce reasoned

that "[t]hese are typical types of documents that are examined at verification."

Final IDM at 15.

      Based on the record evidence, Commerce determined that the Coalition's

claims regarding a lack of information supporting Linyi Chengen's log

consumption data were meritless.  Id. at 15.  Commerce was thus not persuaded

that the Coalition's arguments undermined Commerce's determination that Linyi

Chengen's log consumption data provided the best available information to

calculate Linyi Chengen's normal value in this review.  Id. at 13–19.  As a result,

based on the record evidence, Commerce determined to calculate Linyi Chengen's

normal value using its log inputs in accordance with its normal methodology.  Id.

at 19.

      Defendant contends that the Coalition's argument that the veneer

consumption data are superior is "undercut" by the fact that the same type of

documents used to support Linyi Chengen's log factors of production are also used

to support Linyi Chengen's veneer factors of production.  Def.'s Resp. at 20–21

(referencing, inter alia, Final IDM at 15 (citing Investigation Verification Report

(Sept. 28, 2017) at Ex. 26, Court No. 18-00002, PR 834)).  Defendant and Linyi

Chengen also contend that it was reasonable for Commerce to find that Linyi
Chengen would not maintain bills of materials for the log-to-veneering production
because the bills of materials operated as a "recipe" for production (i.e., production
instruction), and that it would serve no purpose to rely on a recipe that had a single
ingredient (logs) that was placed through a single process (rotary peeling).  See
Final IDM at 15.  Commerce was "well aware of this" practice during the
investigation phase of hardwood plywood from China, according to Linyi
Chengen, and also through "numerous" verifications of multilayered wood flooring
from China.  Linyi Chengen's Resp. at 4; see, e.g., Multilayered Wood Flooring
from the People's Republic of China, 85 Fed. Reg. 78,118 (Dep't of Commerce
Dec. 3, 2020) (final results of antidumping duty administrative review and new
shipper review and final determination of no shipments; 2017–2018); Multilayered
Wood Flooring from the People's Republic of China, 86 Fed. Reg. 21,693 (Dep't
of Commerce Apr. 23, 2021) (preliminary results of countervailing duty
administrative review, and intent to rescind review, in part; 2018).  Linyi Chengen
adds that it confirmed from the beginning that it relied on the Chinese National
Standard, used in the industry by log sellers, to verify its purchases of log volumes.
Linyi Chengen's Resp. at 2.

    The Coalition contends that Linyi Chengen's yield and yield loss ratios are
problematic because the comparison with the Chinese National Standard appeared

to account only for wood removed prior to the peeling process and did not account
for the scrap generated in subsequent steps of the production process, and because
the ratios presume that every veneer produced is usable for plywood production.
Coalition's Br. at 26; Coalition's Reply at 8.  Defendant and Defendant-Intervenors
assert that Commerce sufficiently addressed the Coalition's arguments on yield
and loss.  Def.'s Resp. at 21–23; Linyi Chengen's Resp. at 4–7; Taraca's Resp. at
13–14.  The Coalition disagrees that their arguments are responsive.  Coalition's
Reply at 7–8.

Arguing that rote application of the Chinese National Standard is
inconsistent with Linyi Chengen's own apparent experience (because Linyi
Chengen only uses certain grades in the production of plywood and Linyi Chengen
does not maintain records for veneer quality), the Coalition contends that Linyi
Chengen cannot document the type and quantity of veneers that move through its
inventory or that remain in inventory as unsuitable for plywood production.  See
Coalition's Case Br. at 20–23.  If any of these veneers were not suitable for use in
hardwood plywood, this necessarily means that Linyi Chengen's reported yield
ratio was distorted.  See Linyi Chengen's SDQR at 43, Ex. SQ3-43.4; Coalition's
Br. at 24.  The Coalition refers to additional inferences regarding yield, yield loss,
and veneer disposition, contending that they undermine Commerce's assumption
regarding the feasibility of relying on Linyi Chengen's reported log consumption

data.  See Coalition's Br. at 24; Coalition's Reply at 6–7 (referencing Linyi

Chengen's SDQR at 44, Ex. SQ3-43.3).  The Coalition complains that Commerce

only tangentially refers to this contention by pointing to information showing that

Linyi Chengen disregards very few lower grade core veneers, and in the end

Commerce states that Linyi Chengen's failure to track grades is irrelevant because

the surrogate value used does not reflect grades.  Coalition's Br. at 24–25; see Final

IDM at 16–17; Def.'s Resp. at 21–22.  The Coalition contends that neither of these

statements addresses their actual argument: the first point addresses core veneers

but ignores face veneers, and the second point does not address the effect, if any,

on Linyi Chengen's yield ratio.  Coalition's Br. at 23–25

Linyi Chengen's response is that its yield and yield loss ratios are accurate.

Linyi Chengen contends that the grades of veneers have no influence on the wood

log factors of production because the respondents report the consumption quantity

rather than the actual costs incurred by the company, and regardless of whether a

piece of veneer is of higher or lower grade, it consumed the same or similar

quantity of log in its production.  Linyi Chengen's Resp. at 5.  Linyi Chengen

maintains that it did not sell the core veneers, as they would all be consumed in its

plywood production.  Id.  Defendant's response adds that during the investigation,

Commerce observed workers at verification "repairing veneers by filling in holes

with pieces of wood and tape" as support for Linyi Chengen's claim that Chinese

producers do not disregard lower grade core veneers and that defects are repaired

during the production process.  Def.'s Resp. at 22 (referencing Investigation

Verification Report at 14 and Linyi Chengen's Rebuttal Brief (Jul. 10, 2020)

("Linyi Chengen's Rebuttal Br.") at 4, PR 198).  Defendant also argues that Linyi

Chengen documented all of its core veneers as a single core grade, meaning that

"the veneers can have cracks, holes, stains, [and] knots" and also stated that since

core veneers are not visible in the final product, there are "very few" core veneers

that are not usable.  Def.'s Resp. at 21–22 (referencing Linyi Chengen's CDQR at

11 and Coalition's Letter Placing Info. Investigation R. Admin. Rev. at Ex. 1.2

(Linyi Chengen's SCQR) at 5 and Ex. 4.2 (Linyi Chengen LTFV Rebuttal Brief) at

12).

  The Coalition also argues that Commerce's determination did not adequately

address its arguments regarding the yield loss ratio but merely cited to the second

remand redetermination from the investigation.  Coalition's Br. at 25.  In response,

Defendant claims that Commerce's reference to the second remand

redetermination in the investigation was to explain that it had responded to nearly

identical arguments made by the petitioner, where under protest, Commerce

provided a detailed analysis of Linyi Chengen's yield conversion ratio and

explained why the Coalition had not provided sufficient grounds to disregard Linyi

Chengen's reported log consumption data.  Def.'s Resp. at 22 (referencing Final

IDM at 17); <u>see</u> Final Results of Redetermination Pursuant to Court Remand

("<u>Second Remand Results</u>") at 29, Court No. 19-0002, ECF No. 114.  Included in

that <u>Second Remand Results</u> was an analysis of the log volumes of various sizes,

calculated using the Chinese National Standard and the formula for the volume of a

simple uniform cylinder (V=πr2L).  <u>See</u> Final IDM at 17 (citing <u>Second Remand</u>

<u>Results</u>).  Based on the resulting volumes, Commerce concluded that the difference

between the two volumes was attributable to the taper coefficient accounted for by

the Chinese National Standard and the amount of wood that would need to be

removed from a log until it is a uniform cylinder and more suitable for the rotary

peeling process.  <u>Id.</u>  This determination was sustained by the Court in <u>Linyi</u>

<u>Chengen III</u>.  <u>Linyi Chengen III</u>, 44 CIT at __, 487 F. Supp. 3d at 1355–56.

Commerce thus determined in this case that, although Linyi Chengen's yield

conversion ratio may differ from the Coalition's own experience, the <u>Investigation</u>

Verification Report and Linyi Chengen's documentation supported Linyi

Chengen's reported consumption and production data.  Final IDM at 17.

     The Coalition argues, nonetheless, that in relying on Linyi Chengen's log

records, Commerce did not capture certain cost elements.  Coalition's Br. at 27.  In

particular, the Coalition argues that there is a lack of information regarding how

the volumes represented by the import data surrogate values are calculated.  <u>Id.</u>

The record demonstrates that there are various standards used to measure log

volumes, and that these standards can result in different volumes being calculated for the same log.  See Final IDM at 14.  The Coalition contends that because there is no way of knowing what conversion rates were used in the preparation of the import data, there is inherent uncertainty regarding the accuracy of the log surrogate values as applied to Linyi Chengen's log factors of production; likewise, because Linyi Chengen requires that all logs be custom-cut to 2.6 meters long, it is unknown how this may create additional costs associated with Linyi Chengen's log inputs. Coalition's Br. at 27; Coalition's Reply at 8.  The Coalition claims that these issues are not present with respect to veneers.  Coalition's Reply at 8.

Defendant responds that Commerce has a longstanding practice of valuing factors of production using GTA import data, and there is no information on the record suggesting that the surrogate values based on import data would result in inaccurate or distortive surrogate values.  Def.'s Resp. at 23–24.  Linyi Chengen points out that import surrogate value data does not impugn its calculated quantity of log factors of production in any event.  Cf. Linyi Chengen's Resp. at 7 ("veneer surrogate values (i.e., import values) would also have used a conversion with no guarantee that all countries and parties used the same conversion").  Although the Coalition also argues that the size of the logs Linyi Chengen receives would result in considerable waste and additional costs, Commerce determined that nothing on the record supports the conclusion that Linyi Chengen's suppliers would demand a

premium for the specific size of logs purchased by Linyi Chengen.  Final IDM at

18.  Because Commerce's determinations must be based on the record before it,

Commerce determined that it could not "reach a conclusion on the mere allegation

that such log sizes could theoretically introduce increased scrap or costs because

Commerce's decisions must be based on the weight of the evidentiary record."  Id.;

see Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) ("substantial

evidence is more than a mere scintilla"); Crawfish Processors All. v. United States,

483 F.3d 1358, 1361 (Fed. Cir. 2007) (substantial evidence is "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion")

(quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

        The Coalition's overall argument is that Commerce did not adequately

respond to its arguments that the veneer factors of production constituted the best

available information on the record.  Coalition's Br. at 21.  Defendant's response is

that Commerce did address whether the veneer factors of production data were

more reliable than the log factors of production data, and that Commerce found, for

purposes of this review, that the Coalition's arguments did not demonstrate that the

use of veneer surrogate values over log surrogate values resulted in a more

accurate calculation.  Final IDM at 15; see Shakeproof Assembly Components,

Div. of Illinois Tool Works, Inc. v. United States, 268 F.3d 1376, 1382 (Fed. Cir.

2001) (in determining factors of production, "the critical question is whether the

methodology used by Commerce is based on the best available information and establishes antidumping margins as accurately as possible").  Commerce explained that the HTS subheadings proposed by the Coalition to value Linyi Chengen's veneer factors of production were 4408.90.1000 for hardwood veneer and 4408.10.3000 for coniferous veneer.  Id.  Commerce included the descriptions of the materials covered by these subheadings in the preliminary surrogate value memorandum: "Face Veneer Sheets" and "Coniferous: Face Veneer Sheets."  See Commerce's Prelim Surrogate Value Mem. at Attach. 3f, PR 167–178; see also Coalition's Surrogate Value Comments.  Because the core veneers used by Linyi Chengen are of much lower quality than its face veneer sheets, Commerce concluded that valuing all of Linyi Chengen's veneers, the vast majority of which are core veneers, with a surrogate value for face veneers, would not yield a more accurate calculation.  Final IDM at 15.  The Court concludes that Commerce's determination is reasonable based on the record evidence.

Each side appears to accuse the other of engaging in mere speculation.  See, e.g., Coalition's Br. at 23–29; Def.'s Resp. at 23–24; Linyi Chengen's Resp. at 7–8; Taraca's Resp. at 11.  In particular, the Coalition argues that the conversion method associated with the import data is unknown, so Commerce could not conclude that surrogate values based on such import data provide an "apples-to-apples" basis for application to Linyi Chengen's log volumes.  Coalition's Br. at

28.  However, since verification was precluded by the "Global Level 4 travel advisory" during this review, and Commerce determined to rely on facts available, the Coalition's arguments over yield and yield loss remain speculative, while Commerce's determination to accept Linyi Chengen's calculated quantity of logs is based on facts available and the absence of information on the record suggesting that the surrogate values based on import data would result in inaccurate or distortive surrogate values.  See Def.'s Resp. at 23–24.  The Coalition's summary of the record is not inaccurate, and its arguments are not unreasonable as far as logical inferences may be drawn, but the Coalition's arguments are insufficient to undermine the Final Results.  The Court observes that Commerce's determination is based on the extent of the information before it on the record as a whole, which included consideration of the extent of detracting information.  See Ta Chen Stainless Steel Pipe, Inc. v. United States, 298 F.3d 1330, 1335 (Fed. Cir. 2002).  Thus, on the arguments presented, the Court cannot conclude that Commerce's reliance on its preferred methodology was unreasonable as applied in this instance.  The Coalition's essential argument, at this point, seems to be that the intermediate input methodology is "more reasonable" than Commerce's preferred methodology, but it is well-settled that the Court may not substitute its judgment for that of the

agency when the choice is between two fairly conflicting views.[9]  Universal

Camera Corp., 340 U.S. at 488; see, e.g., NSK Corp. v. United States, 32 CIT 966,

969, 577 F. Supp. 2d 1322, 1329 (2008); American Spring Wire Corp. v. United

States, 8 CIT 20, 22, 590 F. Supp. 1273, 1276 (1984).  The result here, of valuing

the logs Linyi Chengen consumed in producing subject merchandise, is in

accordance with Commerce's general practice of valuing all factors used in each

stage of production when considering integrated firms.  See Linyi Chengen I, 43

CIT at __, 391 F. Supp. 3d at 1289.  The Court holds that substantial record

evidence supports Commerce's reliance on its preferred methodology.

### B.      Log Input Surrogate Values

Commerce selected Malaysia as the primary surrogate country and relied

upon Malaysian import statistics to value Linyi Chengen's primary raw materials,

poplar logs and birch logs.  Prelim. IDM at 19.  Commerce relied upon the 10-digit

import data, HTS 4403.97.10.00 and HTS 4403.95.10.00, from GTA reported on a

cubic meter basis for these inputs.  See Commerce's Final Surrogate Value Mem.

---

[9]  The Coalition's contrast is that Linyi Chengen's "veneer [factors of production] were derived from [bills of materials] and used the actual veneer consumption amounts as reflected on inventory slips for veneers that were pulled directly from inventory and then immediately used in production."  Coalition's Case Br. at 13; see Linyi Chengen's SDQR at 25–26 (explaining that standard consumption for core and face veneers are derived from bills of materials maintained in the normal course of business).  The Coalition's argument is that this is necessarily better and more accurate data than log consumption data.  Coalition's Case Br. at 13–14.

(Nov. 23, 2020) at 2, PR 214–215.  This was consistent with Commerce's practice

of relying on GTA data from the primary surrogate country for surrogate values

unless those values are aberrational or demonstrably unreliable.  Final IDM at 25–

26.  In doing so, Commerce determined that Linyi Chengen had failed to

demonstrate that the Malaysian GTA data were unusual or unreliable, and it did

not find Linyi Chengen's claim that the data were distorted to be substantiated by

the record.  Id. at 27.

    Linyi Chengen and Taraca argue that Commerce should not have relied upon

the Malaysian GTA data because they resulted in high volume densities of

kilogram per cubic meter that were "wholly unreasonable given the known density

of poplar and birch."  Linyi Chengen's Br. at 10; Taraca's Br. at 13.  Linyi

Chengen came to this conclusion by calculating conversion ratios based on the UN

Comtrade data in kilograms divided by the GTA volume data in cubic meters.

Linyi Chengen's Br. at 10; Linyi Chengen's Case Br. at 1–2.  The results, Linyi

Chengen claimed, show that the GTA data are flawed.  Linyi Chengen's Br. at 11;

Linyi Chengen's Case Br. at 2.  Linyi Chengen argues that Commerce should have

relied instead on the six-digit HTS subheadings from UN Comtrade data to address

the alleged inconsistency, or in the alternative Commerce should have used

Romanian data because of the "very low quantity of imports into Malaysia for this

critical surrogate value."  Linyi Chengen's Br. at 11–13.

Consol. Court No. 20-03930                                          Page 48

In its Final IDM, Commerce stated that "[a]lthough [Linyi] Chengen argues

that the Malaysian GTA data must be inaccurate because they demonstrate

impossible log densities, its argument assumes its own conclusion—that the UN

Comtrade data are reliable while the Malaysian GTA data are flawed.  The record

does not support this assumption."  Final IDM at 27.  Defendant emphasizes that

Linyi Chengen did not provide the data necessary for Commerce to evaluate its

claims of aberrancy.[10]  Def.'s Resp. at 35.  More precisely, Defendant contends

that when selected surrogate data are challenged as aberrational, Commerce's

practice is to compare the surrogate values in question to the GTA average unit

values calculated for the same period in other potential surrogate countries to the

extent that such data are available, a practice recently sustained by this Court, see

The Ancientree Cabinet Co. v. United States, 45 CIT __, __, 532 F. Supp. 3d 1241,

1253–55 (2021), and that Commerce evaluates claims of aberrational data by

_____

[10]  Linyi Chengen disputes that it made a claim of "aberrancy," insisting that it
"made a distinct, different argument that the quantity is too small for the [average
unit volume ('AUV')] to be a commercial value and a representative surrogate
value," Linyi Chengen's Br. at 13, but that appears to be a distinction without a
difference.  "The burden is on interested parties to provide Commerce with
information in support of their arguments."  Final IDM at 27 (citing QVD Food
Co., Ltd. v. United States, 658 F.3d 1318, 1324 (Fed. Cir. 2011)).  Generally, when
"faced with a choice between two imperfect options, it is within Commerce's
discretion to determine which choice represents the best available information."
Dorbest Ltd. v. United States, 30 CIT 1671, 1687, 462 F. Supp. 2d 1262, 1277
(2006).

examining historical data from the same HTS category for the surrogate country over multiple years. Def.'s Resp. at 37–38 (citing Trust Chem. Co. v. United States, 35 CIT 1012, 791 F. Supp. 2d 1257 (2011)). Linyi Chengen did not place either set of data on the record for Commerce to compare. See Final IDM 26–27. Because the burden of creating an adequate record lies with interested parties and not with Commerce, QVD Food Co., Ltd. v. United States, 658 F.3d 1318, 1324 (Fed. Cir. 2011), Defendant argues that Linyi Chengen cannot now complain that Commerce did not conduct such an evaluation, when Linyi Chengen did not provide Commerce with data on the record to do so, nor is it of any consequence that Linyi Chengen itself purchased wood in greater quantities. Def.'s Resp. at 38 (citing Final IDM 38–39).

The Court concludes that Linyi Chengen's attempt at showing an alternate method of demonstrating aberrancy is not without reason underpinning it, but in the final analysis it is insufficient to overcome Commerce's point that Linyi Chengen's calculation assumes the validity and reliability of the UN Comtrade data. Linyi Chengen claims that its Rule 56.2 brief addressed Commerce's line of argument and that the United States failed to address Linyi Chengen's further argument that logs are not, in fact, measured on a cubic meter or other volume basis. Linyi Chengen's Reply at 2. (For example, the logs are not placed in water to determine their actual cubic meter volume displacement; rather, they are either

weighed or the cubic meter volume is calculated using a formula.)  Linyi Chengen

responds that "the Malaysian GTA import statistics include an apparent error in the

[cubic meter] <u>calculated</u> volume."  <u>Id.</u> (emphasis in original).  The response,

however, assumes the reliability and validity of the UN Comtrade data in drawing

that conclusion.

Commerce concluded that Linyi Chengen's claims regarding the GTA data

did not undermine Commerce's determination that the Malaysian GTA data, which

were in cubic meters at the ten-digit level, were superior to the UN Comtrade data

reported in kilograms and at the six-digit level.  Final IDM at 27.  Because

Commerce addressed Linyi Chengen's arguments, evaluated the record evidence,

and determined that the Malaysian GTA data were the best available information

on the record to value Linyi Chengen's log inputs, the Court agrees with

Commerce's determination.

Linyi Chengen argued in the alternative that Commerce could have relied

upon the Romanian import statistics to value Linyi Chengen's log inputs.[11]  Linyi

_____

[11]  According to Linyi Chengen, Malaysia only imported insignificant and non-
commercial quantities of Linyi Chengen's primary two raw materials (birch logs
and poplar logs).  Linyi Chengen's Br. at 12 (citing Coalition's Prelim. Surrogate
Values; Linyi Chengen's Final Surrogate Value Comments at Ex. 1).  During the
period of review of 18 months, Malaysia imported only 75 cubic meters of birch
logs under HTS 4403.95.1000 from only one country, Latvia, during only one
                                                        (footnote continued)

Chengen's Br. at 12.  Romania imported 29,033 cubic meters of poplar logs under

HTS 4403.97.00 and 128 cubic meters of birch logs under HTS 4403.95.10.  Id.

(citing Linyi Chengen's Prelim. Surrogate Values at Ex. SV-2).  Linyi Chengen

argues that the Romania import statistics, particularly for poplar logs, represents a

far more commercial quantity.  Id.  Taraca supports Linyi Chengen's argument that

the Romanian values at least "corroborated" the six-digit UN Comtrade data for

Malaysia.  See Taraca's Br. at 14.

     Here, Linyi Chengen's arguments regarding the superiority of the Romanian

import data fail for several reasons.  Commerce explained that because Romania

was neither at the same level of economic development as China during this period

of review nor selected as the primary surrogate country in this review, it was not

appropriate to rely on the Romanian import data.  Final IDM at 27.  This is

consistent with Commerce's practice.  Commerce "normally will value all factors

in a single surrogate country."  19 C.F.R.§ 351.408(c)(2).  No party has challenged

Commerce's selection of Malaysia as the primary surrogate country.  Commerce

will "only resort to a secondary surrogate country if data from the primary

_____

 month of the period of investigation, April 2018.  See id.  Malaysia also imported
only 59 cubic meters of poplar logs under HTS 4403.97.1000 from Belgium,
during June 2018.  See id.  Linyi Chengen argues these are not commercial
quantities when considered against the other import quantities on the record and
the quantity consumed by respondents.  Id.

surrogate country are unavailable or unreliable."  See Jiaxing Bro. Fastener Co. v.

United States, 38 CIT 1404, 1412, 11 F. Supp. 3d 1326, 1332–33 (2014) (citations

omitted), aff'd, 822 F.3d 1289 (Fed Cir. 2016).  Commerce avoids selecting data

from countries that are not at the same level of economic development so long as

there are suitable options from the countries on the surrogate country list.  See

Policy Bulletin No. 04.1.  The Court has long recognized that Commerce has

discretion over what methods to employ to carry out its statutory mandate.  See,

e.g., Wheatland Tube Corp. v. United States, 17 CIT 1230, 1245, 841 F. Supp.

1222, 1234 (1993) ("Commerce has broad discretion to choose a methodology to

satisfy the statutory mandate.").  The argument that Commerce was unreasonable

in relying on Malaysia's importation of "insignificant" and "non-commercial"

quantities of Linyi Chengen's primary inputs of birch logs and poplar logs during

the period of review is inconsistent with Commerce's established methodology,

and the Court concludes that the established methodology is reasonable.

Commerce "need not prove that its methodology was the only way or even the best

way to calculate surrogate values for factors of production as long as it was a

reasonable way."  Coal. for the Preservation of Am. Brake Drum and Rotor

Aftermarket Mfrs. v. United States, 23 CIT 88, 118, 44 F. Supp. 2d 229, 258

(1999); see The Ancientree Cabinet Co., 45 CIT at __, 532 F.Supp.3d at 1258.  In

other words, Commerce need not duplicate the exact production experience of the

Chinese manufacturers at the expense of choosing a surrogate value that most

accurately represents the fair market value of the respective input in a hypothetical

market-economy.  See Nation Ford, 166 F.3d at 1377.  Furthermore, Commerce

does not automatically consider that small quantities necessarily result in

aberrational import values.  Sichuan Changhong Elec. Co. v. United States, 30 CIT

1481, 1501, 460 F. Supp. 2d 1338, 1356 (2006) (Commerce does not have "a

longstanding practice of omitting import values merely because they were the

product of a small quantity of imported goods."); see Final IDM at 26.

Commerce's position is that small import quantities are not inherently distortive

but must instead be demonstrated to be too small to be a viable surrogate source.

See Trust Chem. Co., 35 CIT at 1019–20, 791 F. Supp. 2d at 1264–65.  Linyi

Chengen did not make that showing here.

        In light of the above, the Court considers Linyi Chengen's remaining

arguments on commercial significance and the preferability of Romanian data

unavailing.  Because the record evidence supports Commerce's determination that

the Malaysian GTA data were reliable, Commerce reasonably determined that it

did not need to resort to data from a country that was not economically comparable

to China during the period of review.  Commerce also determined that the

relatively low import quantities of birch and poplar into Malaysia alone did not

impugn the accuracy of the log surrogate values derived from the Malaysian

import data, which are specific to the input consumed by Linyi Chengen.  Final

IDM at 26.  When Commerce provides a reasoned basis for finding that the

selected data satisfy its criteria and constitute better data than Plaintiff's

alternatives, the Court refrains from "substitut[ing] its own evidentiary evaluation

for Commerce's and to substitute its own judgment for the agency's in considering

and weighing the relative importance of the various criteria applied."  Bristol

Metals L.P. v. United States, 34 CIT 478, 484, 703 F. Supp. 2d 1370, 1376 (2010)

(internal citation and quotation omitted).  Accordingly, the Court sustains

Commerce's valuation of Linyi Chengen's log inputs using the Malaysian GTA

data.

## II.    Labor Surrogate Value

Linyi Chengen next challenges Commerce's reliance upon "Trading

Economics – Malaysia" wage data in the Final Results, see Final IDM at 30,

arguing that the labor rate sourced from the Malaysian Department of Statistics

("MDS wage data"), relied upon in the preliminary results, is the best available

information to value labor because the data are more specific to Linyi Chengen's

production process.  Linyi Chengen's Br. at 4–8.  Linyi Chengen argues that the

Trading Economics data is a general manufacturing labor rate, covering all

manufacturing industries, and that it is less detailed than the Malaysian wage data,

which are specific to the "Manufacture of Veneer Sheets and Plywood."  Id. at 4.

Linyi Chengen also argues that the MDS wage data are more contemporaneous to the period of review, since they cover the entire 18 months, versus the Trading Economics data, which only cover six months of the period of review.  Id. at 5.

The Court concludes that substantial record evidence supports Commerce's selection of the Trading Economics data as the best available information to value Linyi Chengen's labor.  See Final IDM at 31.  When examining the two data sources, Commerce determined that the MDS wage data included technical notes that called into question the accuracy of these data.  Id.  Commerce determined that the raw data included "full-time" workers who work less than 24 days a month and less than eight hours a day, which is Commerce's standard assumption, as well as part-time workers who work for less than six hours a day and/or less than 20 days a month, and Commerce explained that including such workers in the normal calculation for a labor surrogate value (a value that includes 24 working days a month and eight working hours a day) would understate the resultant labor surrogate value.[12]  Id. at 31–32.  Because the data did not differentiate the numbers of full- and part-time workers counted in the data, Commerce explained that it

---

[12]  The MDS wage data explain that "[t]he employment data cover full-time and part-time employees" and defines full-time employees as "paid workers who work for at least six hours a day and for at least 20 days a month," and part-time employees as "paid workers who work for less than six hours a day and/or less than 20 days a month."  See Linyi Chengen's Rebuttal Surrogate Values at Ex. SVR-4 (Technical Note 7).

could not determine the degree of distortion or could not control for any

inaccuracies with a different calculation.  Id.  The MDS wage data also indicated

that the data exclude employer contributions to the "Employees' Provident Fund"

and "Social Security Organisation,"[13] and Commerce inferred that it could not be

certain of the impact of this exclusion on the calculation.  Id. at 32.  By contrast,

Commerce concluded that the Trading Economics data represented manufacturing-

specific and contemporaneous wage data from the primary surrogate country, did

not suffer from the same deficiencies as the MDS wage data, and therefore

represented the best available information for valuing Linyi Chengen's labor

factors of production for the Final Results.  Id.

Linyi Chengen argues that the MDS wage data are definitely "more specific"

to its production process, and that while Commerce may not know the exact

number of part-time employees included in the MDS wage data, Commerce can

still make a reasonable estimation of the hours covered by that data.  Linyi

Chengen's Br. at 5–6; Linyi Chengen's Reply at 9–10.  Linyi Chengen contends

that part-time employment is far less common and Commerce has no reason to

believe that a "significant" portion of the laborers worked fewer than its normal

assumption of eight hours a day, 24 working days in a month.  Linyi Chengen's Br.

---

[13]  See id. (Technical Note 8).

at 5–6.  Linyi Chengen argues that Commerce "almost always" has to make some

sort of assumption in its hourly labor calculation, so the additional consideration of

slightly lowering its normal assumption to consider the presence of some part-time

employees is not unreasonable.  Linyi Chengen's Br. at 6.  For example, to

calculate an hourly wage, Commerce divides the total wages by the total

employees to arrive at total monthly wages per employee, and then divides that

number by an assumption of the hours worked in a month.  Id. at 5.  Because most

labor sources do not provide an hourly rate, Commerce has a long-standing

practice of having to apply an assumption to the hours worked in a month.  Id.

Linyi Chengen thus argues that the MDS wage data are still usable and has other

significant advantages regarding specificity and contemporaneity.  Id. at 6.

        Given that Commerce questioned the usability of the MDS labor data

because of part-time employment, Linyi Chengen also criticizes the Trading

Economics data as providing no information on whether they do or do not also

include part-time employees.  Id.  Linyi Chengen points out that the two-page

Trading Economics webpage printout provides no description about the data,

which labor rates are an average monthly wage in manufacturing, or their source,

which provides no definition of what employees are covered by this wage data—in

other words, "[Commerce] has no evidence to support the contention that the

Trading Economics data does not suffer the same deficiency as the [MDS] data."
Id. (citing Coalition's Surrogate Value Comments at M-3).

Further, regarding Commerce's determination that Technical Note 8 of the
MDS wage data indicates that employer contributions to "Employees' Provident
Fund [ ] and Social Security Organisation [ ]" are excluded, Final IDM at 32, Linyi
Chengen also argues that the MDS wage data affirmatively does explain that the
salaries and wages paid include "cash payments, including bonuses, commissions,
overtime wages, cost of living allowances and other allowances made to all
employees during the reference month.  The employees' contribution to
Employees' Provident Fund [ ] and Social Security Organisation [ ] is included."
Linyi Chengen's Reply at 10 (quoting Linyi Chengen's Rebuttal Surrogate Values
at Ex. SVR-4).  "Therefore, the [MDS wage] data is in fact very encompassing of
the cost of labor and provides specific details on the benefits included."  Linyi
Chengen's Br. at 7.

Commerce is presumed to have considered the entire record.  See Final IDM
at 18 ("Commerce's decisions must be based on the weight of the evidentiary
record.").[14]  This necessarily follows from the presumption of administrative

---

[14]  Accord, e.g., Fujitsu Ltd. v. United States, 23 CIT 46, 50 n.5, 36 F. Supp. 2d
394, 398 n.5 (1999); Companhia Paulista De Ferro-Ligas v. United States, 20 CIT
                                                          (footnote continued)

regularity "as to the record it prepares, because the agency, as the decision-maker, is generally in the best position to identify and compile those materials it considered." JSW Steel (USA) Inc. v. United States, 44 CIT __, __, 466 F. Supp. 3d 1320, 1328 (2020) (emphasis added). Linyi Chengen is essentially asking the Court to substitute its judgment for that of Commerce, which the Court cannot do. The fact that the MDS wage data may be "more specific" to Linyi Chengen's production process, if Commerce does not deem it so, does not render Commerce's selection of the Trading Economics data unreasonable, in light of the current state of the law and the uncertainty Commerce identified in this proceeding with respect to what the MDS wage data represent. The statute does not require Commerce to perfectly replicate a non-market economy respondent's production experience. See Juancheng Kangtai Chem. Co. v. United States, 2017 Ct. Intl. Trade LEXIS 3, at *31, 2017 WL 218910, at *10 (Ct. Int'l Trade Jan. 19, 2017) (citing Nation Ford, 166 F.3d at 1378).

---

 473, 476 (1996); Torrington Co. v. United States, 16 CIT 220, 224, 790 F. Supp. 1161, 1167 (1992), aff'd, 991 F.2d 809 (Fed. Cir. 1993); Bando Chem. Indus., Ltd. v. United States, 16 CIT 133, 136, 787 F. Supp. 224, 226 (1992); Nat'l Ass'n of Mirror Mfrs. v. United States, 12 CIT 771, 779, 696 F. Supp. 642, 648 (1988); British Steel Corp. v. United States, 8 CIT 86, 98, 593 F. Supp. 405, 414 (1984); Rhone Poulenc, S.A. v. United States, 8 CIT 47, 55, 592 F. Supp. 1318, 1326 (1984); Sprague Elec. Co. v. United States, 2 CIT 302, 310, 529 F. Supp. 676, 682 (1981).

Linyi Chengen's alternative argument for using the Romanian labor value

evidence on the record fails for the same reason, regardless of whether it does not

have the problem of part-time wage data.  See Linyi Chengen's Br. at 7–8

(referencing, inter alia, Linyi Chengen's Prelim. Surrogate Values at Ex. 5).  Linyi

Chengen fails to demonstrate that Commerce's determination that it did not need to

resort to data from a country that was not economically comparable to China

during the period of review was unreasonable.

Thus, considering the foregoing, the Court concludes that Commerce's

selection of the "Trading Economics – Malaysia" data and its calculation of the

labor surrogate value was reasonable and supported by substantial evidence.

### III.    Formaldehyde Surrogate Value

Linyi Chengen and Taraca challenge Commerce's determination as to the

surrogate value for formaldehyde.

#### A.    Motion to Strike

As a preliminary matter, Defendant filed a motion to strike Attachment 1 of

Linyi Chengen's Reply and references to that attachment pursuant to USCIT Rule

81(m).  See Def.'s Mot. Strike ("Defendant's Motion to Strike" or "Def.'s Mot.

Strike"), ECF No. 48.  Defendant contends that Linyi Chengen's Reply raises a

new argument on the formaldehyde surrogate value and includes new factual

information not on the record of the underlying investigation and not raised in

Linyi Chengen's prior written materials.[15]  Id. at 1–2.  Linyi Chengen did not

respond to Defendant's Motion to Strike.

The Court's review of antidumping duty administrative proceedings is

limited by statute to the record before the agency.  19 U.S.C. § 1516a(b)(2)(A)

(defining scope of record for review in proceedings before the Court of

International Trade); see S. Rep. No. 96-249, at 247–48 (1979) (judicial review of

antidumping proceedings is based on "information before the relevant decision-

maker at the time the decision was rendered").  The administrative record in this

case consists of all materials properly submitted to or obtained by Commerce in

connection with the affirmative final determination in an antidumping duty review

of hardwood plywood from China.  See 19 U.S.C. § 1516a(b)(2); Final Results, 85

Fed. Reg. 77,157.  The complete list of those documents is set forth in the indices

of the administrative record that Commerce filed with the Court.  See Admin. R.

Index, ECF No. 23.  The additional documents that Linyi Chengen included in

Attachment 1 to Linyi Chengen's Reply concern events that occurred after

issuance of the Final Results and are not part of the administrative record in this

---

[15]  Defendant's specific objection is to Linyi Chengen's argument that Commerce
should have sent supplemental questionnaires to Linyi Chengen regarding
formaldehyde valuation, which Attachment 1 indicates as letters from Commerce
to Linyi Chengen pertaining to a subsequent and separate administrative
proceeding.  Def.'s Mot. Strike at 1–2; see also Linyi Chengen's Reply at 8–9 and
Attachment 1.

Consol. Court No. 20-03930                                        Page 62

case under 19 U.S.C. § 1516a(b)(2).  Because the scope of judicial review in

antidumping proceedings is based on the "information before the relevant decision-

maker at the time the decision was rendered," QVD Food Co., 658 F.3d at 1324–

25 (quoting S. Rep. No. 96-249, at 247–48), any further consideration of them here

would not be proper.  See USCIT R. 81(m).[16]  The Court will therefore grant

Defendant's motion to strike and will disregard Linyi Chengen's post-Final Results

references and attached material.

### B.     Selection of Formaldehyde Surrogate Value

Turning to the merits, Linyi Chengen's brief in support of its motion for

judgment on the agency record calls attention to the fact that Commerce

preliminarily valued the formaldehyde input using HTS 2912.11.10 for formalin, a

liquified form of formaldehyde, i.e., methanol.  Linyi Chengen's Br. at 8; see

Commerce's Prelim. Surrogate Value Mem. at Attachment 1.  In briefing before

---

[16]  USCIT Rule 81(m) provides: "A brief or memorandum must be concise,
logically arranged, and free from burdensome, irrelevant, immaterial, pejorative
and scandalous matter.  A brief or memorandum not complying with this rule may
be disregarded by the court."  USCIT Rule 81(m).  The Court has broad discretion
in deciding motions to strike.  Beker Indus. Corp. v. United States, 7 CIT 199,
200, 585 F. Supp. 663, 665 (1984).  In general, since motions to strike are
considered an "extraordinary remedy," they are generally "not favored by the
courts and are infrequently granted."  Jimlar Corp. v. United States, 10 CIT 671,
673, 647 F. Supp. 932, 934 (1986) (citation omitted).  The usual remedy, in
situations such as this, is to disregard such extraneous matter.  See, e.g., Jacobi
Carbons AB v. United States, 42 CIT __, __ n.17, 313 F. Supp. 3d 1308, 1321
n.17 (2018).

Commerce, the petitioner contested the test reports submitted by Linyi Chengen,

arguing that Linyi Chengen failed to demonstrate that the formaldehyde used in

Linyi Chengen's production process was "formalin" and that Commerce should

therefore rely upon HTS 2912.11.90, which covers "other forms of methanol

formaldehyde."  See Coalition's Case Br. at 35–37; Final IDM at 29.  For the Final

Results, Commerce agreed in part with the petitioner in determining that:

> [the] test reports were not accredited to any testing agency, nor did they
> contain any indication that they pertained to [Linyi] Chengen
> (including, significantly any link to [Linyi] Chengen's production of
> plywood). . . .   The test reports also failed to specify if the percentage
> of formaldehyde reported was with respect to mass or volume.

Final IDM at 30.  Determining uncertainty in the type of formaldehyde that Linyi

Chengen used in plywood production, Commerce therefore relied on an average of

both HTS 2912.11.10 and HTS 2912.11.90.  Id.

Linyi Chengen argues that the record establishes that its input is best

classified as formalin, and therefore that the best available information to value this

input is HTS 2912.11.10.  Linyi Chengen's Br. at 8.  Linyi Chengen placed on the

record evidence that formalin is defined as a 37 percent solution of formaldehyde

as well as the three test reports of formaldehyde input mentioned above that Linyi

Chengen claims it purchased during the period of review.  See Linyi Chengen's

Rebuttal Surrogate Values at Exs. SVR-1, SVR-2.  According to Linyi Chengen,

those test reports "definitely" demonstrate the formaldehyde concentration of the

input ranged from 36.87 to 37.1 percent, "which was well within the tolerance

concentration standard for 37% solution" of formaldehyde. Linyi Chengen's Br. at

8–9 (citing Linyi Chengen's Rebuttal Surrogate Values at Ex. SVR-2).[17]  Linyi

Chengen contends that the record thus establishes that its formaldehyde input

meets the definition of formalin, and that HTS 2912.11.10, which is specific to

formalin, is the most specific HTS to value this input and therefore the best

available information. Linyi Chengen's Br. at 9; see Qingdao Sea-Line Trading

Co. v. United States, 766 F.3d 1378, 1386 (Fed. Cir. 2014) (product-specificity is

the most important surrogate value factor).

    Taraca, in support of Linyi Chengen, also contests Commerce's reliance on

the average of data for HTS 2912.11.10 and 2912.11.90 to derive the surrogate

value for Linyi Chengen's formaldehyde input. Taraca's Br. at 15 (referencing

Final IDM at 30 and Taian Ziyang Food Co. v. United States, 35 CIT 863, 907,

783 F. Supp. 2d 1292, 1330 (2011) ("product specificity logically must be the

primary consideration in determining best available information" (internal

quotation and citation omitted)). Taraca argues that the best available information

on the record to value Linyi Chengen's formaldehyde input was HTS subheading

2912.11.10 (pertaining to formalin) and that Commerce disregarded Linyi

---

[17] "Even the full name of the input is called '37% Level Industrial Use
Formaldehyde Solution.'"  Linyi Chengen's Br. at 9.

Chengen's three testing reports improperly as well as the industry definitions

submitted by Linyi Chengen stating that formalin is a 37% solution of

formaldehyde.  Id. at 15–16 (referencing Linyi Chengen's Rebuttal Br. at 12 (citing

Linyi Chengen's Rebuttal Surrogate Values at Ex. SVR-1)).  Taraca contends that

Commerce's determination was unreasonable, given that Linyi Chengen's

evidence was accompanied by a certification from the company and its counsel

attesting to the veracity of the information submitted. Id. at 16; see Linyi

Chengen's Rebuttal Surrogate Values (company certification; representative

certification).  According to Taraca, Commerce pointed to no competing evidence

on the record suggesting that Linyi Chengen's input was not formalin—in other

words, "Commerce had before it (i) data from one HTS that was shown to be

specific to the input that Linyi Chengen used (i.e., 2912.11.10) based on certified

record evidence and (ii) data from another HTS that pertained to an input not used

by Linyi Chengen (i.e., 2912.11.90) and that could not be attributed to Linyi

Chengen absent speculation."  Taraca's Br. at 16.  Taraca thus argues: "It is

unreasonable for Commerce to elevate speculation over certified record evidence."

Id. at 16; Inner Mong. Jianlong Bioch. Co., Ltd. v. United States, 41 CIT __, __,

279 F. Supp. 3d 1332, 1340 (2017) ("[t]his court's standard of review requires

more from Commerce than reference to a dearth of evidence and a conclusion

based upon mere speculation") (citing Thai Plastic Bags Indus. Co v. United

States, 37 CIT 354, 360, 904 F. Supp. 2d 1326, 1332 (2013)).  And yet, Taraca

claims, this is exactly what Commerce did in the Final Results, by ignoring record

evidence showing that Linyi Chengen actually used formalin and instead relying

on speculation that it had no reason to favor the HTS specific to formalin over the

other, less specific HTS code.  Taraca's Br. at 16–17.  Taraca claims that "in

reality" the record evidence shows that the best available information, based on

certified submissions from Linyi Chengen including testing reports and industry

standards, was import data reported under HTS subheading 2912.11.10 because

subheading 2912.11.10 was most specific to Linyi Chengen's actual formaldehyde

input, and that Commerce's inclusion of the data for HTS 2912.11.90 in

determining the surrogate value for formaldehyde was not supported by substantial

evidence.  Id. at 17.

        Defendant contends that in order to value Linyi Chengen's formaldehyde,

Commerce reasonably averaged the input for the HTS subcategories HTS

2912.11.10.00, defined as "Formalin," and HTS 2912.11.90.00, defined as

"Other," because the record did not support the claim that Linyi Chengen's input

met the specifications of formalin.  Def.'s Resp. at 39.  Addressing Linyi

Chengen's and Taraca's argument that Commerce should have valued Linyi

Chengen's formaldehyde using HTS subheading 2912.11.10 (which is specific to

"formalin"), Defendant argues that Commerce's decision to average the two HTS

categories was reasonable based on the record.  Id.  Specifically, Defendant

contends that Commerce examined the three test reports that Linyi Chengen placed

on the record claiming that they demonstrate that the formaldehyde concentration

of its input ranged from 36.87 to 37.1 percent.  Id.; see also Linyi Chengen's

Rebuttal Surrogate Values at Ex. SVR-2.  Defendant explains that Commerce

determined that the test reports were not accredited to any testing agency, nor did

they contain any indication that they pertained to Linyi Chengen, much less Linyi

Chengen's production of plywood.  Def.'s Resp. at 39 (citing Final IDM at 29;

Linyi Chengen's Rebuttal Surrogate Values at Ex. SVR-2).

In addition, Defendant points out that the test reports failed to specify if the

percentage of formaldehyde reported was with respect to mass or volume (formalin

must contain 40 percent formaldehyde by volume or 37 percent by mass).  Id.

Defendant argues that Commerce determined that there was insufficient support

for valuing Linyi Chengen's input with the category specific to formalin alone

(HTS 2912.11.10).  Id.  As a final point, Defendant argues that in evaluating the

other HTS subheadings, including 2912.1 defined as "Methanal (formaldehyde),"

and 2912.11.90.00 "Other," Commerce determined that the descriptions did not

provide sufficient information to determine which subheading was most specific to

Linyi Chengen's formaldehyde input.  Id. at 39–40; see also Final IDM at 29.

Given the uncertainty as to whether Linyi Chengen's formaldehyde was "formalin"

or some other type of formaldehyde, Commerce determined that there was no basis

to favor one HTS subheading over the other.  Final IDM at 30.  Therefore,

Defendant contends, Commerce reasonably valued Linyi Chengen's formaldehyde

input using the average of HTS subheadings 2912.11.10 and 2912.11.90.  Def.'s

Resp. at 40; Final IDM at 30.

      As with other issues addressed in this opinion, Linyi Chengen's and

Taraca's arguments to the contrary over Commerce's surrogate value for

formaldehyde amount to mere disagreements with Commerce's rational

determination.  The function of the Court is to evaluate "whether a reasonable

mind could conclude that Commerce chose the best available information."

Goldlink Indus. v. United States, 30 CIT 616, 619, 431 F. Supp. 2d 1323, 1327

(2006).  On that question, "when faced with a choice between two imperfect

options, it is within Commerce's discretion to determine which choice represents

the best available information."  CS Wind Vietnam Co. v. United States, 38 CIT

376, 393, 971 F. Supp. 2d 1271, 1288 (2014) (quotation omitted).  The Court

concludes that substantial evidence supports Commerce's reticence to credit the

three test reports to Linyi Chenyen's formaldehyde input for the reasons stated by

Commerce.  Taraca complains that the company and representative certifications

of Linyi Chengen's Rebuttal Surrogate Values attested that the information is

"accurate and complete," but the "submitting entry" field on the test reports all

merely indicate "our factory," and there is no indication of an accredited testing

agency, a state that is not incompatible with attestations of accuracy and

completeness as submitted.  See Linyi Chengen's Rebuttal Surrogate Values at Ex.

SVR-2.  The Court also notes that when Commerce selects import statistics as a

means of valuing factors of production for a non-market economy, in general it

prefers an average price derived from the broader range of prices.  See Dorbest

Ltd. v. United States, 30 CIT 1671,1687, 462 F. Supp. 2d 1262, 1277 (2006).

Linyi Chengen and Taraca's arguments here are insufficient to undermine

Commerce's determination to rely on an average of both HTS 2912.11.10 and

2912.11.90.  The Court sustains Commerce's determination.

## IV.    Surrogate Financial Ratios

After calculating the total value of the factors of production, Commerce adds

"an amount for general expenses and profit plus the cost of containers, coverings,

and other expenses."  19 U.S.C. § 1677b(c)(1).  Commerce achieves this by

calculating surrogate financial ratios derived from the financial statements of one

or more companies that produce identical or comparable merchandise, preferably

in the primary surrogate country.  See, e.g., Shanghai Foreign Trade Enters. Co. v.

United States, 28 CIT 480, 482, 318 F. Supp. 2d 1339, 1341 (2004).

Commerce selects financial statements based on "specificity,

contemporaneity, and quality of the data."  See, e.g., Dongguan Sunrise Furniture

Co. v. United States, 37 CIT 489, 496, 904 F. Supp. 2d 1359, 1365–66 (2013). In

addition, Commerce will not use financial statements that it has reason to believe

or suspect are distorted by countervailable subsidies and those that show no profit.

Specifically, Commerce's practice is "to rely on the financial statement of a

company that is or may be the beneficiary of subsidies, so long as those subsidies

were not previously found countervailable by Commerce." See Shenzhen Xinboda

Indus. Co. v. United States, 45 CIT __, __, 494 F. Supp. 3d 1347, 1351 (2021)

(sustaining Commerce's remand explanation of its practice regarding financial

statements used in the surrogate final ratio); see also Clearon Corp. v. United

States, 35 CIT 1685, 1688, 800 F. Supp. 2d 1355, 1359 (2011).

        In assessing which of the financial statements on the record constituted the

best available information, Commerce considered the quality, specificity, and

contemporaneity of the available data, and evidence of tax and subsidies. See

Final IDM 20–22; see also Qingdao Sea-Line Trading Co., 766 F.3d at 1386; 19

U.S.C. § 1677b(c)(1); Policy Bulletin No. 04.1. Commerce determined that the

financial statements for Focus Lumber, Fu Yee, and Ta Ann constituted the best

available information on the record. Final IDM at 21.

## A.    Inclusion of Fu Yee Financial Statement

        The Coalition argues that Commerce should not have relied on the financial

statements of Fu Yee because those statements showed that the company was not

profitable.  Coalition's Br. at 38–39.  Commerce determined, however, that the

record does not support the Coalition's argument.  Final IDM at 21.  Instead, the

record supports Commerce's conclusion that Fu Yee's financial statements show

that the company was profitable at the time.  See Linyi Chengen's Final Surrogate

Value Comments at Ex. SV2-3.  Commerce explained that, although the profit rate

for Fu Yee was lower compared to other financial statements, the financial

statement did not indicate that the company was not profitable.  Final IDM at 21

(citing Linyi Chengen's Final Surrogate Value Comments at Ex. SV2-3).

     Commerce declined to further investigate certain line items that the

Coalition claimed called into question whether Fu Yee was indeed profitable.  Id.

Commerce explained it does not look beyond the face of the statements themselves

and engage in speculation as to what each item includes or how each item should

be treated.  Id. (citing Diamond Sawblades and Parts Thereof from the People's

Republic of China, 78 Fed. Reg. 11,143 (Dep't of Commerce Feb. 15, 2013) (final

results of antidumping duty administrative review; 2009–2010), and accompanying

issues and decision memorandum at cmt. 16; Certain New Pneumatic Off-The-

Road Tires from the People's Republic of China, 73 Fed. Reg. 40,485 (Dep't of

Commerce Jul. 15, 2008) (final affirmative determination of sales at less than fair

value and partial affirmative determination of critical circumstances), and

accompanying issues and decision memorandum at cmt. 18B).  Because the data in

the financial statements have been prepared and examined by the appropriate

financial authorities, in accordance with the generally accepted accounting

principles applicable to the relevant surrogate country, Commerce relied upon the

treatment of these items as they are reflected in the financial statement when

utilizing the line items in the financial ratio calculations.  Final IDM at 21.

Further, the record shows that the auditor for Fu Yee provided an

unqualified opinion as to the accuracy of Fu Yee's financial statements, and thus

Commerce found no reason to find the stated profit figure unreliable.  Id.; see

Linyi Chengen's Final Surrogate Value Comments at Ex. SV2-3.  In response to

the Coalition's claim that the "hire purchase payables" identified in its brief

indicated that Fu Yee incurred late fees related to overdue payment, Commerce

explained that the notes of the financial statement only identified that a portion of

this payable is due within 12 months and a portion is due after 12 months and that

the outstanding amount bore an interest rate of 4.93 percent, not that Fu Yee was

being assessed an overdue payment fee.  Final IDM at 21.  Commerce reiterated

that it would not be appropriate to look behind the financial statements themselves

and treat the outstanding payables amount essentially as a write-off (in direct

conflict with the assessment of Fu Yee's auditors) and count this amount against its

profit for fiscal year 2018.  Id.  Accordingly, Commerce determined that the record

evidence indicated that Fu Yee was a profitable company during the period of

review and that its financial statements constituted the best available information

on the record, and thus included Fu Yee's financial statements in the calculation of

surrogate financial ratios.  Id.  The Court concludes that Commerce's

determination to include Fu Yee's financial statements in the surrogate financial

ratios was reasonable and supported by substantial evidence.

### B.     Inclusion of Tan Ann Financial Statement

The Coalition argues that Commerce should not have included the financial

statement for Ta Ann in the surrogate financial ratio because Commerce's prior

subsidy determinations indicate that Ta Ann received countervailable subsidies.

Coalition's Br. at 36–38.  However, the Coalition never articulated its precise

argument before Commerce that Ta Ann received countervailable subsidies, and

therefore failed to exhaust its administrative remedies.  The argument that the

Coalition made before Commerce was limited to a claim that "Ta Ann's financial

statements indicate that it was the beneficiary of tax subsidies as referenced in its

financial notes: '[u]nutilised reinvestment allowance, being tax incentives that is

not a tax base of an asset, is recognised as a deferred tax asset . . . .'"  Coalition's

Case Br. at 33–34 (citing Linyi Chengen's Final Surrogate Value Comments at Ex.

SV2-8).  The Coalition stated in its administrative case brief that "[f]urthermore,

Ta Ann's financial statements show an increase of 317,000 RM in reinvestment

allowance in 2018 that was 'recognised in profit or loss.'" Id. at 34 (citing Linyi

Chengen's Final Surrogate Value Comments at Ex. SV2-8).

   In response to the allegation that Ta Ann had received subsidies, Commerce

explained that there is a distinction between a party receiving a subsidy or

receiving a subsidy that Commerce had previously countervailed.  Final IDM at

22.  Commerce examined the relevant record evidence and determined that there

was no record evidence indicating that Ta Ann was receiving any countervailable

subsidies.  Id.  Specifically, Commerce explained that the Coalition "provided no

information as to how this reinvestment allowance constitutes a subsidy from a

program that Commerce previously found to be countervailable."  Id.  As

explained above, Commerce's practice is "to rely on the financial statement of a

company that is or may be the beneficiary of subsidies, so long as those subsidies

were not previously found countervailable by Commerce."  See Shenzhen Xinboda

Indus. Co., 45 CIT at __, 494 F. Supp. 3d at 1351.  Thus, because there was no

record evidence to support a conclusion that these tax subsidies had previously

been found by Commerce to be countervailable, the Court concludes that

Commerce reasonably included the Ta Ann financial statements in its calculation

of the surrogate financial ratios.  Final IDM at 22.

   The Coalition now argues that the subsidies Ta Ann received were

previously countervailed, and they cite a case not previously mentioned on the

record of this proceeding for support of their position, <u>Certain Frozen Warmwater Shrimp from Malaysia</u>, 78 Fed. Reg. 50,381 (Dep't of Commerce Aug. 19, 2013) (final affirmative countervailing duty determination).  Coalition's Br. at 37.  Neither the Coalition nor any other party raised this argument before Commerce.

Congress has directed that this Court "shall, where appropriate, require the exhaustion of administrative remedies."  28 U.S.C. § 2637(d).  The statute "indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies."  <u>Boomerang Tube LLC v. United States</u>, 856 F.3d 908, 912 (Fed. Cir. 2017) (citing <u>Corus Staal BV v. United States</u>, 502 F.3d 1370, 1379 (Fed. Cir. 2007)).  Commerce's regulations specifically require that a party raise all arguments in a timely manner before the agency.  <u>Corus Staal</u>, 502 F.3d at 1379 (citing 19 C.F.R. § 351.309(c)(2)).  And "general policies underlying the exhaustion requirement—protecting administrative agency authority and promoting judicial efficiency"—would be vitiated if the court were to consider arguments raised for the first time in judicial proceedings.  <u>See id.</u> (internal quotation and citation omitted).

For these reasons, courts "generally take[ ] a 'strict view' of the requirement that parties exhaust their administrative remedies before [Commerce] in trade cases."  <u>See id.</u>  None of the limited exceptions to the exhaustion requirement

apply here, i.e., if exhaustion would have been "futile," the relevant matter is a

"pure question of law," an intervening court decision would affect the agency's

action, or a party had no reason to believe the agency would not follow established

precedent.  Luoyang Bearing Factory v. United States, 26 CIT 1156, 1186 n.26,

240 F. Supp. 2d 1268, 1297 n.26 (2002) (citing authorities).

      When an interested party to the administrative proceeding is concerned that

Commerce should use data in a particular way, it is incumbent on the party to raise

the issue in their case briefs.  Boomerang Tube, 856 F.3d at 913; accord Mittal

Steel Point Lisas Ltd. v. United States, 548 F.3d 1375, 1384–1385 (Fed. Cir. 2008)

(explaining that "courts should not topple over administrative decisions unless the

administrative body not only has erred but has erred against objection made at the

time appropriate under its practice." (quoting United States v. L.A. Tucker Truck

Lines, Inc., 344 U.S. 33, 37 (1952))) (emphasis added in Mittal Steel Point Lisas

Ltd.).  Here, the Coalition did not develop the argument that Ta Ann received

countervailable subsidies during the administrative review.  The Coalition now

seeks to raise a new argument, with new information, that they did not present to

Commerce.  Compare Coalition's Case Br. at 33–34 with Coalition's Br. 36–38.

The Court concludes that Commerce's determination to include the Ta Ann

financial statement in the surrogate financial ratio was reasonable and supported by

substantial record evidence.  In addition, asserting an argument for the first time in

litigation by claiming that Commerce "failed to address information that detracted from its decision" when that "information" was not raised before Commerce does not relieve a party of its obligation to exhaust its remedies.

### C.    Rejection of Megamas Financial Statement

Taraca challenges Commerce's decision to exclude Megamas's financial statements in the calculation of the surrogate financial ratios.  Taraca's Br. at 9–13 Taraca contends that Commerce did not provide a reasonable explanation for rejecting a company's financial statements where the company's current liabilities may exceed the company's current assets.  Id. at 11.  Taraca also claims that Commerce failed to explain why the other financial statements that it relied on were the best available information.  Id.

Commerce explained that it was not including the Megamas financial statement in the surrogate financial ratio calculation because the auditor's report for Megamas included a note of material uncertainty, which "cast significant doubt on the Company's ability to continue as a going concern."  Final IDM at 22 (citing Linyi Chengen's Final Surrogate Value Comments at Ex. SV2-5).  Commerce acted similarly in Certain Frozen Fish Fillets from the Socialist Republic of Vietnam, 85 Fed. Reg. 23,756 (Dep't of Commerce Apr. 29, 2020) (final results of antidumping duty administrative review and final determination of no shipments; 2017–2018), and accompanying issues and decision memorandum at cmt. 2C.  In

that case, Commerce relied instead on the financial statements of a profitable

company that reflected no additional shortcomings.  See id.; see also NTSF

Seafoods Joint Stock Co. v. United States, 46 CIT __, Slip .Op 22-38, 2022 Ct.

Intl. Trade LEXIS 40, at *53, 2022 WL 1375140, at *17 (Ct. Int'l Trade Apr. 25,

2022) ("Thus, here there were two conflicting regulatory preferences—the

preference for using multiple financial statements and the preference for a single

surrogate country.  It is not this court's role to balance those preferences.

Commerce explained why it considered one Indian company's financial statement

reliable and why it found the Indonesian statements inadequate, and it then chose

to give priority to the single-country preference over the two-statement

preference.") (sustaining in relevant part; remanding on other grounds).  Similarly

here, when weighing the financial statements, Commerce determined that the

Megamas statement did not constitute the best available information on the record

when compared to the three remaining financial statements that contained no notes

of concern, and thus Commerce did not include the Megamas statement in the

surrogate financial ration calculation.  Final IDM at 22.

Given Commerce's discretion to determine what information is the "best

available information," and the fact-specific nature of this case-by-case inquiry, the

Court's review of Commerce's determination considers "not whether the

information Commerce used was the best available, but rather whether a

reasonable mind could conclude that Commerce chose the best available information." <u>Jiaxing Bro.</u>, 822 F.3d at 1300–01 (citing <u>Zhejiang DunAn Hetian Metal Co. v. United States</u>, 652 F.3d 1333, 1341 (Fed. Cir. 2011)).  Given Commerce's expressed concern about material uncertainty of the Megamas statement, the Court concludes that Commerce's determination to exclude the Megamas financial statement was reasonable and supported by substantial evidence.

To summarize, Commerce's determination that the Focus Group, Fu Yee, and Ta Ann financial statements were the best available information on the record to calculate the surrogate financial ratios is based on substantial evidence and in accordance with the law.  In selecting from the available financial statements, Commerce exercised its discretion to choose the appropriate financial statements to calculate surrogate financial ratios.  <u>See</u> <u>FMC Corp. v. United States</u>, 27 CIT 240, 251 (2003) (holding that Commerce acts within its discretion by choosing among reasonable alternatives), <u>aff'd</u>, 87 F. App'x 753 (Fed. Cir. 2004).

Accordingly, Commerce's determination on its selection of financial statements is sustained by this Court.

## V.    Challenge to Separate Rate

The Court notes that Taraca adopted and incorporated by reference the comments, if any, filed by other plaintiff-respondent parties to the extent they

challenge the determination of the rates applied to Linyi Chengen and the

determination of the separate rate, to the extent such comments are not inconsistent

with their own arguments.  Taraca's Br. at 17.  However, in light of this opinion,

arguments on a redetermination of the separate rate are moot.

## CONCLUSION

For the foregoing reasons, the Court concludes that substantial record

evidence supports: (1) Commerce's reliance on its preferred methodology;

(2) Commerce's valuation of Linyi Chengen's log inputs using the Malaysian GTA

data; (3) Commerce's selection of the "Trading Economics – Malaysia" data and

its calculation of the labor surrogate value; (4) Commerce's use of an average of

HTS 2912.11.10 and HTS 2912.11.90; and (5) Commerce's determination to

include financial statements of Fu Yee and Ta Ann and to exclude the financial

statements of Megamas in the surrogate financial ratios.  The motions for summary

judgment filed by Plaintiff Coalition for Fair Trade in Hardwood Plywood, ECF Nos.

32–33, Consolidated Plaintiffs and Defendant-Intervenors Richmond International Forest

Products, LLC, Taraca Pacific Inc., and Concannon Corporation, ECF No. 30, and

Defendant-Intervenor Linyi Chengen Import and Export Co., Ltd. and Consolidated

Plaintiffs and Defendant-Intervenors Xuzhou Jiangheng Wood Products Co., Ltd. and

Xuzhou Jiangyang Wood Industries Co., Ltd., ECF No. 31, are denied.

Consol. Court No. 20-03930                                        Page 81

Defendant's motion to strike, ECF No. 48, is granted.  In accordance with this

opinion, judgment dismissing this consolidated action will be entered.

                                               /s/ Jennifer Choe-Groves
                                            Jennifer Choe-Groves, Judge

Dated:    December 22, 2022
              New York, New York